**BANCO NACIONAL DE CUBA, Plaintiff,**

v.

**CHASE MANHATTAN BANK, Defendant.**

**BANCO PARA EL COMERCIO EXTERIOR DE CUBA, Plaintiff,**

v.

**FIRST NATIONAL CITY BANK, Defendant.**

**Nos. 60 Civ. 4663–CLB, 61 Civ. 0410–CLB.**

United States District Court, S. D. New York.

Jan. 4, 1980.

Rabinowitz, Boudin, Standard, Krinsky & Lieberman by Victor Rabinowitz, New York City, for Cuba.

Milbank Tweed Hadley & McCloy by Andrew J. Connick, New York City, for Chase-Manhattan Bank.

Shearman & Sterling by Charles Manuel, New York City, for First Nat'l City Bank.

Davis Polk & Wardwell by James Benkard, James Kerr, New York City, for First Bank of Boston.

BRIEANT, District Judge.

The first of these actions was filed November 28, 1960 by Banco Nacional de Cuba (hereinafter "Banco Nacional") against Chase Manhattan Bank (hereinafter "Chase"). The second above entitled action was filed February 1, 1961 by Banco Para el Comercio Exterior de Cuba (hereinafter "Bancec") against First National City Bank (hereinafter "Citibank"). Both cases arise out of events following and connected with the recent Cuban Revolution and the consequent change in the economic, social and political structure of the Republic of Cuba.

These cases are two out of a larger number of similar cases pending in this Court. By separate orders made on August 7, 1961 by Hon. Sylvester J. Ryan, then Chief Judge of this Court, each of these cases were assigned for all purposes to Hon. Frederick vanPelt Bryan, pursuant to Rule 2 of the Civil Rules of this Court as then in effect. The cases were tried before Judge Bryan, who thereafter departed this life on April 17, 1978.

Following the death of Judge Bryan, these cases were reassigned to me, and the parties have stipulated and agreed through their counsel that the issues may be resolved by the Court based upon all the proceedings and papers before the late Judge Bryan, without the necessity of reopening the trial record, taking additional proof or observing the demeanor of any witnesses.

The Court has subject matter jurisdiction of the respective complaints under 28 U.S.C. § 1332(a)(2). The counterclaims pleaded in each case are conceded to be recoverable only as set-offs to the extent that a plaintiff prevails on its respective complaint.

Although these cases have not been consolidated, they present related issues of fact and law, and the post-trial hearings before me were conducted jointly. Accordingly, and to avoid repetition it seems appropriate that the issues presented be determined in a single decision.

Familiarity is assumed with the stipulated and conceded facts in these cases, which will not be recited except to the extent necessary for an understanding of the issues presented. Familiarity is also assumed with the prior litigation tried before the late Judge Bryan, *Banco Nacional de Cuba v. First National City Bank*, 270 F.Supp. 1004 (S.D.N.Y.1967), *rev'd*. 442 F.2d 530 (2d Cir. 1971), *rev'd*. 406 U.S. 759, 92 S.Ct. 1808, 32 L.Ed.2d 466, *reh. denied* 409 U.S. 897, 93 S.Ct. 92, 34 L.Ed.2d 155 (1972); *on remand* 478 F.2d 191 (2d Cir. 1973) (hereinafter "Banco I"). Plaintiffs have reserved their right to relitigate on subsequent appeal the legal points determined in the *Banco I* case, but their counsel concedes that for purposes of proceedings in this district court, those issues are precluded by the plurality opinions of the Supreme Court in 406 U.S. 759, 92 S.Ct. 1808, 32 L.Ed.2d 466 et seq. and the determination on remand in 478 F.2d 191. For additional discussion of these issues, see *Banco Nacional de Cuba v. Sabbatino*, 193 F.Supp. 375 (S.D.N.Y.1961), *aff'd*. 307 F.2d 845 (2d Cir. 1962), *rev'd*. 376 U.S. 398, 84

S.Ct. 923, 11 L.Ed.2d 804 (1964); *on remand, sub nom. Banco Nacional de Cuba v. Farr*, 243 F.Supp. 957 and 272 F.Supp. 836 (S.D.N.Y.1965), *aff'd*. 383 F.2d 166 (2d Cir. 1967), *cert. denied* 390 U.S. 956, 88 S.Ct. 1038, 20 L.Ed.2d 1151, *reh. denied* 390 U.S. 1037, 88 S.Ct. 1406, 20 L.Ed.2d 298 (1968), and also the legislative history leading to the enactment of the so-called "Hickenlooper" or "Sabbatino" Amendment, now 22 U.S.C. § 2370(e)(2), passed by Congress to frustrate in part the apparent or perceived rule of the Supreme Court in the *Sabbatino* case.

## II

### Background

There is much literature concerning the events in Cuba following the overthrow of the Batista Government. Much of this literature is partisan in nature and of no assistance in setting forth the background of events described below. Sufficient it is to state that the effective date of the revolution in Cuba, which began in the Sierra Maestra Mountains in December 1956 is generally agreed to have been January 1, 1959.

Almost immediately after the overthrow of the Batista administration, a national government was established by Castro, Che Guevera and others, which concentrated under one hand all the executive and legislative functions of the Cuban Government. The Castro Government regarded itself as a lawful continuum of the pre-existing government of the Republic of Cuba and built for the most part on pre-existing law and institutions, making substantial but piecemeal changes to effect its revolutionary goals. Following the assumption of power it began a swift sequence of social changes in Cuba's internal affairs, and in its relationships with foreign powers and the aliens then resident in Cuba.

Almost immediately, new currency control regulations were imposed, and those regulations were gradually tightened. Banco Nacional was restructured internally in the fashion described below, and it became the sole official licensor of all foreign payments and any remissions of profits earned in Cuba by alien owned enterprises. From time to time, amendments to these regulations and changes in the policy under which they were administered, contrived to place continuously greater limitations on international trade with Cuba. Also limited thereby was the transaction of domestic business in Cuba, including banking, and the enjoyment of property, by foreigners.

Following the revolution, many members of the propertied and professional classes in Cuba took refuge in foreign countries; they fled the realm. Cuba began a swift and purposeful transition from an economy in which most of the means of production were owned and controlled by private individuals and firms, both native and alien, to a nation where the economy was more closely controlled by Government, and where the Government directly or indirectly assumed ownership and operation of the means of production. This new Government has been described loosely in the briefs as a "socialist" Government. At least within the classical definition of these words, it was not. In socialism, we are taught that the workers own and control the means of production. In Cuba, after the revolution, the Cuban Government owned and controlled the means of production, to a gradually increasing extent. The resulting internal organization may best be described as "state capitalism."

By various statutes and decrees, ownership and control of the properties and businesses of those who fled Cuba following the revolution became vested in the Cuban Government. On May 17, 1959 an "agrarian reform law" was enacted, looking towards nationalization and dismemberment of large land holdings in a nation which had previously founded its economy largely on the production of sugar for export. This agrarian reform was administered by an arm of the Cuban Government known as INRA (El Institutio Nacional de Reforma Agraria), which proceeded to act in the nature of a state-owned trading corporation, owning the sugar production facilities and disposing of the export sugar crop.

Persons or entities called "interventors" were appointed by the Cuban Government to confiscate and conduct numerous business enterprises owned by absentees, native and foreign.

In November 1959, Banco Nacional de Cuba, the central bank of the Republic of Cuba, was reorganized, and Che Guevera was appointed President of Banco Nacional.

These significant social changes, hereinafter referred to in totality and for simplicity as "the social changes" were accompanied by the usual rhetoric, and by promises, viewed and intended to be viewed by some as threats, that more of the same was to follow shortly. And it did.

Sugar in the world market had been a surplus commodity for many years. Cuban sugar producers had been granted an import quota, politically administered and changed annually, for sugar to be licensed by the United States Government for importation into the American market. In the United States, the price of sugar has traditionally been maintained at a level above the world competitive price, and close to the marginal costs of American beet and cane sugar producers, in order to insure survival of domestic producers. The administration and allotment of the sugar import quotas had been an essential part of American foreign policy for many years in dealing not only with Cuba, but with other sugar producing nations. Adjustments in the sugar quota were treated as diplomatic rewards and punishments for foreign nations producing sugar, based upon their international conduct, their perceived friendliness, and treatment accorded to American nationals.

As a result of rapidly deteriorating foreign relations between the new Cuban Government and the United States, and the abhorrence which nature has for a vacuum, even in diplomacy, the Soviet Union, on February 13, 1960, was able to enter into a barter-type commercial agreement with Cuba by which large quantities of Cuban sugar were permitted to enter Russia and Russian-dominated trading partners where that sugar had not previously been sold.

That sugar was to be paid for in merchandise, including, but not limited to armaments produced in the Soviet Union. The United States reacted to this perceived disloyalty or threat to its security by in effect abolishing Cuba's share of the sugar quota, and preventing entry of Cuban sugar into the United States market. See 74 Stat. 330 (1960), which became a law on July 6, 1960.

On July 6, 1960, as an immediate response to the enactment of the aforementioned statute repealing the Cuban sugar quota, the Cuban Government enacted Law No. 851 providing for the nationalization of the businesses and properties located in Cuba of United States citizens. On August 6, 1960, twenty-six United States owned corporations, branches or businesses were nationalized. Interventors were appointed to run each of these businesses for the Cuban Government, and no compensation was made, then or since, to the American owners. On September 16, 1960, United States banking operations in Cuba operated by Chase, Citibank and others were confiscated in the fashion set forth below in greater detail.

Diplomatic relations between the two countries came to an end; transfer of funds between the United States and Cuba was interdicted in both countries. So it remains today.

## III

### Organization of Banco Nacional

Banco Nacional was organized by Law No. 13 of December 23, 1948, effective December 30, 1948. Prior to the revolution it was the central bank of Cuba. It had all of the powers of a local commercial bank within the Republic of Cuba, and was engaged in national and international banking. It also exercised the administrative and fiscal powers of government over private banking, much to the same extent that the Federal Reserve System does in the United States, or as the Bank of England or any other central bank, is accustomed to do in the countries allowing private internal or international trade and banking.

One-half of the stock of Banco Nacional had been subscribed for and issued to the Government of the Republic of Cuba. Prior to the Cuban Revolution of 1959, the remaining half had been issued to subscribing private banks, which were required to participate. Its president and three out of five directors were appointed by the Republic. The Government shared in the profits of the Bank after the payment of dividends to its shareholders and appropriations to reserves. Banco Nacional had the sole power to issue currency in the Republic of Cuba, such currency being regarded as an obligation of the Cuban state. It set maximum interest rates for private banks, acted as fiscal agent and economic advisor to the Government, and as agent for the Currency Stabilization Fund created simultaneously and by the same Law No. 13 of 1948.

Prior to the Revolution, Banco Nacional had acted as the representative of the Cuban Government in the International Monetary Fund and the International Bank of Reconstruction and Development. It was exempted from taxation, was the sole designated depositary of state funds, had the power to make loans to the Currency Stabilization Fund and possessed detailed powers and corporate purposes to assist the Currency Stabilization Fund in the exercise of the latter's duty to protect the national currency in international trade. Under Cuban law Banco Nacional had the power to sue and could be sued, and had a specifically authorized capital. Under domestic law it was not liable for any of the duties or obligations of the Cuban Government or any other agency, and its liability was limited to its own capital and assets. That is to say, the Government was not responsible for its debts.

Banco Nacional was given the power to regulate the operations of existing commercial banks and "any other natural or artificial person" habitually engaged in banking. Banks already established prior to 1948 were required to register with Banco Nacional, and upon doing so could continue their business, subject to the regulation of Banco Nacional.

After the Revolution, and particularly by Resolution No. 2 of Law No. 851, dated September 17, 1960, and by Law No. 891 of October 13, 1960, discussed below, Banco Nacional assumed a number of additional governmental functions. There was a studied effort to preserve a continued corporate existence, while reorganizing the central bank to conform it to the new order. Banco Nacional became thereby wholly owned by the Cuban Government as sole shareholder, with all assets and profits vested in or accruing to the Treasury of the Cuban Government. Banco Nacional can be regarded as an essential element or arm of the present Cuban Government, at least at all times on and after September 17, 1960, and perhaps earlier as a result of *de facto* assumption of absolute control. This status of Banco Nacional as an *alter ego* of the Republic of Cuba has been confirmed and adjudicated before. *Banco I*, 478 F.2d 191, 193 (2d Cir. 1973).

As a foundation on which further legislation could be based, the Cuban Revolutionary Government enacted the "Fundamental Law," effective February 7, 1959. Article 24 of this Fundamental Law regulated confiscation of property by the State. In principle, it barred any deprivation of property except by "competent judicial authority, for justified reasons, . . . and always upon due payment of adequate indemnity." However, Article 24 contained an exception to this general rule, which was relied on as authority for the numerous expropriations that were to come. This exception authorized the confiscation of property held by the "Tyrant" [Batista, the prior dictator] and any of his collaborators "responsible for the crimes committed against the national economy . . . or who have enriched themselves illicitly."

Pursuant to Article 24's provision for the expropriation of property, Law No. 851 was enacted on July 6, 1960. This conferred full authority upon the President and the Prime Minister of the new government to nationalize, through forced expropriation, property held by United States nationals. The President and the Prime Minister were giv-

en the power to appoint persons or agencies necessary to administer the nationalized properties, and the appraisers to determine the value of the properties. Law No. 851 provided for payment to be made, based on the appraised value, for the property expropriated.

Law No. 851 was executed through resolutions, only one of which is relevant here. Resolution No. 2, signed by President Torrado and Prime Minister Castro on September 17, 1960, ordered that all the property of Chase, Citibank and The First National Bank of Boston be nationalized through forced expropriation, and that the President of Banco Nacional administer the assets and the banking businesses of these firms. Further, the resolution declared that the member of the Board of Directors of Banco Nacional who was appointed by the "foreign" banks pursuant to Law No. 13, Article 23 (enacted December 23, 1948) would cease to represent the nationalized banks while on the Board. In accordance with this resolution, the branch banks and the assets in Cuba of Citibank, Chase and The First National Bank of Boston were expropriated.

Law No. 851 and the accompanying Resolution No. 2 were both promulgated for the stated purposes of defense of the national sovereignty and protection of the economic development process of Cuba, and to remove a perceived imperialist threat on the part of the banks. The next step in further nationalization of property was the adoption of Law No. 890 and Law No. 891, which were enacted together on October 13, 1960.

Law No. 890 nationalized the "large industrial and business enterprises [other than banks, but including railroads] which [had] not yet adapted . . . to the revolutionary reality."

## IV

*Nationalization*

Law No. 891 of October 13, 1960 was entitled as the "Bank Nationalization Law." Its preamble noted that the monetary and credit policy forms part of the general economic policy of the Government and performs a fundamental strategic function in the assignment and orientation of the productive resources of the country; that it was essential to change the old banking structure of the nation, and adjust to the new conditions of economic development created as a consequence of the revolutionary process, and that the creation of currency and extension of credit should be public functions, vested exclusively in the State in accord with the requirements of economic planning, and should not be in the hands of private concerns, which operate under the urge of profit and with greater consideration to individual than to collective interests. The preamble adjudged that it was necessary, to achieve the foregoing objectives, to nationalize and expropriate in favor of the State *all* the national private banking concerns that operate in the nation as a step precedent to the definitive structure of the national banking system.

Law No. 891 by Article I declared the banking function public, to be carried only by the State, through the organs created for that purpose. By Article III of that Law it was ordered that the nationalization and subsequent adjudication to the Cuban State ordered in the preceding Article be effected through Banco Nacional de Cuba as the autonomous body charged with moving the banking function of the State. Banco Nacional was declared to be the legal successor, subrogated in the place and stead of a natural or juridical person engaged as a banker, and it was legislated that upon the "consequent taking over of Banco Nacional de Cuba of the assets and liabilities of the juridical persons or companies affected by this law" they were declared dissolved and extinguished. Article V of the Law provided that the partners or stockholders of the juridical persons or companies dissolved or extinguished were entitled to the right of indemnity resulting from the appropriations ordered, and that payment will be made by liquidating the corporate credits or shares as well as the dividends or profits earned up to the effective date of this Law "according to the system of appraisal select-

ed by the President of the Bank" (Banco Nacional de Cuba) at the close of operations December 31, 1960. Additional provisions are set forth requiring the issuance of bonds for part of the amounts due. The statute provided that Banco Nacional "shall assume liability for the deposits existing in the banks" affected by the Law, and shall "guarantee the owners thereof as to the normal handling of the operations related thereto."

The Board of Directors and the assembly of stockholders of Banco Nacional were "dissolved" and their functions assumed by the President of the Bank under the advice of a Consultative Council of the highest ranking officials of other specialized banks. The Currency Stabilization Fund, established June 10, 1939 was dissolved and reorganized. By Article XVI, two Canadian banks, Royal Bank of Canada and Bank of Nova Scotia, were exempted from nationalization. These were acquired later.

Law No. 930, adopted February 23, 1961, reorganized Banco Nacional de Cuba further. It purported to continue the independent juridical status and patrimony of the Bank, but also provided that it should exercise the monetary sovereignty of the nation, the monopoly of the power to issue currency.

## V

### The Claims and Counterclaims

Banco Nacional as plaintiff asserts its claim against Chase in its capacity as successor in interest of other Cuban banking institutions owned by the Cuban Government. On August 19, 1958 Chase had loaned $30,000,000, later reduced by partial payments, to Banco de Desarollo Economeco y Social (hereinafter "Bandes") and Fonda de Establizascion de la Moneda (hereinafter "Fonda"). The loan was secured by United States obligations. On February 17, 1960, Bandes and Fonda were each dissolved by Law No. 730, enacted on that date, and by statute, Banco Nacional succeeded to their assets and liabilities. On August 17, 1960, a further payment of $5,000,000 was made to Chase by Banco

Nacional on account of the Bandes loan, which reduced the amount owed to $10,000,000, the amount due at the time of the nationalization of Chase's Cuban banking branches. Additionally, Banco Nacional then had on deposit with Chase at its home office, $2,500,000, together with $37,622 accrued interest.

On or about September 19, 1960, after learning of the confiscation of its Cuban branches, Chase sold the remaining collateral which it then held for the Bandes loan for an amount in excess of $17,000,000. After applying the amount so realized to the payment of the outstanding principal and interest on the Bandes loan, Chase was left with a surplus of $7,256,398. Chase was thus indebted to Banco Nacional in that sum, plus the amount of Banco Nacional's deposit with accrued interest, making a total of $9,794,020. Chase does not dispute that it was indebted to Banco Nacional in that amount. It concedes liability on the complaint, and asserts the four separate counterclaims or set-offs discussed below.

## VI

### Bancec's Status

Plaintiff in the second above entitled action, Banco Para el Comercio Exterior de Cuba, referred to by the parties for convenience as "Bancec," was a Cuban bank established by Law No. 793 of May 4, 1960. As can be seen below, it too is properly regarded as an *alter ego* of the Cuban Government to the same extent that Banco Nacional has been so found to be, and for substantially the same reasons.

For an understanding of the relevant corporate history of Bancec, we must digress slightly, to describe the claim asserted here in its behalf.

As a result of the Agrarian Reform Act of May 17, 1959, INRA had become the owner of a cargo of animal feed sugar sold by Bancec pursuant to contract for delivery into the United States. The contract was supported by an irrevocable letter of credit in the favor of Bancec, issued in New York

on August 18, 1960 by Citibank in the amount of $650,000 U. S. funds payable at sight on readiness to discharge in a U. S. port. On that date, Citibank was operating its branches in Cuba. The "intervention" of its branches and those of Chase, discussed herein, did not take place until September 17, 1960.

On September 15, 1960 Citibank received from Banco Nacional for collection, a sight draft and supporting documents authorizing payment of $193,280.30 for a portion of the sugar actually delivered and discharged at Pascagoula, Mississippi. On September 20, 1960, following intervention, Citibank "paid" the draft to the account of Banco Nacional and purported to set-off the proceeds against the value of its Cuban branches, then in possession of Banco Nacional.

By Law No. 930, dated February 23, 1961, Bancec was dissolved, and Banco Nacional succeeded to all the assets, rights and claims of Bancec "peculiar to the banking business." No disposition of any other assets or claims of Bancec was made in Law No. 930.

At the time of the enactment of Law No. 930, the claim sued upon herein had the status of a draft upon an irrevocable letter of credit. Such a *res* or chose in action is regarded as being the sort of asset, right and claim peculiar to the banking business, and accordingly, probably should be regarded as vested in Banco Nacional as of February 23, 1961. In any event, Banco Nacional had previously made claim on Citibank as the collecting agent.

Thereafter, by Law No. 934, promulgated on the same day, the assets and claims of Bancec *not* peculiar to the banking business were vested in the Ministry of Foreign Trade of the Government of Cuba. This governmental body was authorized to establish entities, in the nature of state trading corporations, under its supervision to conduct foreign trade. This law provided that the Ministry was not to be liable for any obligations these enterprises might undertake. The Ministry of Foreign Trade, by Resolution No. 1, dated March 1, 1961, created Empresa Cubana de Exportaciones

(Cuban Enterprise for Exports), which was empowered to conduct all commercial export operations of the nation formerly conducted by Bancec— "remaining subrogated in the rights and obligations of said bank (Bancec) as regards the commercial export activities." This particular assignment or delegation must be regarded as irrelevant because the sugar, which is the subject of this lawsuit, had already been delivered, and at the time of the Resolution, had become transformed into a debt.

Thereafter, by Resolution No. 102, issued by the Ministry of Foreign Trade on December 29, 1961, Empresa Cubana de Exportaciones was dissolved as of December 31, 1961. On January 1, 1962, the same Ministry issued Resolution No. 1 of that year, creating Empresa Cubana Exportadora de Azucar y sus Derivados, referred to at trial and hereinafter as "Cuba Zucar." It succeeded to the rights and obligations of Bancec relating to foreign commerce in sugar and its derivatives.

By motion docketed in this litigation on May 2, 1975, plaintiff moved for an order pursuant to Rule 25, F.R.Civ.P., substituting Empresa Cubana Exportadora de Azucar y sus Derivados (Cuba Zucar) as the plaintiff herein. In opposition to that motion defendant argued that despite the provisions of the various laws and resolutions having to do with the devolution of the claim, which Citibank regarded as self-serving, the subsequent agencies could not be insulated from the counter-claims of defendant against the Cuban Government, and that none of the subsequent agencies could take any more or obtain any better title than its predecessors, the Ministry of Foreign Trade of the Republic of Cuba, or Bancec. As background for the May 2, 1975 motion, the parties had previously stipulated that the Republic of Cuba itself should be substituted as a plaintiff, and should serve an amended complaint. A stipulation to that effect was marked "SO ORDERED" on July 6, 1961. This stipulation, docketed July 7, 1961, authorized the "supplemental complaint in the form annexed," but no such supplemental complaint

was apparently annexed or submitted to the Court. No such amended complaint was ever served and filed, and no formal substitution of the Republic of Cuba took place.

By a memorandum decision docketed August 4, 1975, Judge Bryan denied the motion to substitute Cuba Zucar, pointing out that substitution of parties under Rule 25(c), F.R.Civ.P. lies "in the sound discretion of the court."

## VII

*Real Party in Interest*

These occurrences naturally inject a question of "real party in interest" into the discussion of Bancec's claim. The Court perceives no significance or validity to any arguments based on that concept. Bancec and its successors in interest are to be equated with the Cuban Government. Bancec was created by the Government to engage in a state function. All of its capital was contributed by the Government, and it had no function to fulfill, except to manage the export of commodities for the account of the Government. Thereafter, the devolution of the claim, however viewed, brings it into the hands of the Ministry, or Banco Nacional, each an *alter ego* of the Cuban Government. For our purposes we accept the present contention of plaintiff's counsel that the order of this Court of July 6th permitting, but apparently not requiring, the service of an amended complaint in which the Republic of Cuba itself would appear as a party plaintiff in lieu of Bancec was based on counsel's erroneous assumption, or an erroneous interpretation of the laws and resolutions providing for the devolution of the assets of Bancec. Assuming this to be true, it is of no moment. The Ministry of Foreign Trade is no different than the Government of which its minister is a member.

Citibank also argues as an alternate theory, that Banco Nacional is the real party in interest here because the draft against the letter of credit was deposited with Banco Nacional as an agent for collection (¶ 7 of Court's Ex. 1, Stipulation). Banco Nacional made demand on Citibank in New York for payment in dollars and under prevailing local banking practice, would be required to and would, account in Havana to Bancec for the proceeds in Cuban pesos. Citibank argues therefrom in effect, that it honored the draft in favor of Banco Nacional, and instead of remitting the funds to Banco Nacional, set-off its claims against Banco Nacional against the funds which it had become obligated to pay, not Bancec, but Banco Nacional. This analysis, if accepted, would place Bancec in the status of a beneficiary of a promise by Citibank to pay Banco Nacional, and thereby subject it to the defenses and set-offs existing in favor of Citibank against Banco Nacional.

The Court rejects as invalid this alternate theory of set-off as between banks. The relationships here are regulated by § 350–a, *et seq.* of the New York Negotiable Instruments Law, since repealed effective September 27, 1964, as to transactions occurring after that date, upon adoption of the Uniform Commercial Code. That section provided in relevant part:

"§ 350–a. Bank as agent for collection.

Except as otherwise provided by agreement and except as to subsequent holders of a negotiable instrument payable to bearer or indorsed specially or in blank, where an item is deposited or received for collection, the bank of deposit shall be agent of the depositor for its collection and each subsequent collecting bank shall be sub-agent of the depositor but shall be authorized to follow the instructions of its immediate forwarding bank and any credit given by any such agent or sub-agent bank therefor shall be revocable until such time as the proceeds are received in actual money or an unconditional credit given on the books of another bank, *which such agent has requested or accepted.* Where any such bank allows any revocable credit for an item to be withdrawn, such agency relation shall nevertheless continue except the banks shall have all the rights of an owner thereof against prior and subsequent parties to the extent of the amount withdrawn." [Emphasis added]

This section, adopted in 1929, was declaratory of prior New York law, at least as to the point under consideration. *McBride v. The Farmers Bank of Salem, Ohio*, 26 N.Y. 450, 454 (1863) and prior New York cases cited therein, reached this result on reasoning that the collecting bank was not a *bona fide* holder in due course for value, because antecedent debt is not such a consideration. On this actual point hung the dispute between New York State courts and the Supreme Court following the decision in *Swift v. Tyson*, 41 U.S. (16 Pet.) 1, 10 L.Ed. 865 (1842) overruled in *Erie R. R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). *Compare, The Bank of the Metropolis v. The New England Bank*, 42 U.S. (1 How.) 234, 11 L.Ed. 115 (1843) permitting set-off by a collecting bank as sought herein. In a pre-*Erie* case, *Carnegie Trust Co. v. First Nat. Bank of the City of New York*, 213 N.Y. 301, 304 (1915) the New York Court of Appeals (per Cardozo, J.) assumed, but found it unnecessary to hold, that a collecting bank had the right before it made remittance to apply the collections against its deposit with the plaintiff bank of deposit. The Court suggested that the issue would turn on "the relation between the [collecting] bank and the plaintiff," which it characterized as "obscure." The Court noted that if the bank held the drafts for collection only, as trustee or agent for the depositor, "the rules of equitable set-off do not permit a trustee or agent to apply a claim in his own right in cancellation of his liability as a fiduciary," citing *Morris v. Windsor Trust Co.*, 213 N.Y. 27, 106 N.E. 753 (1914).

Thereafter, in *Dakin v. Bayly*, 290 U.S. 143, 54 S.Ct. 113, 78 L.Ed. 229 (1933), the Supreme Court, in a case involving a Florida statutory scheme similar to § 350, *et seq.* of the New York NIL, distinguished *Bank of the Metropolis, supra*, and held that in light of the agency relationship existing between the depositor and forwarding bank, no set-off could be permitted in favor of the collecting bank for lack of mutuality. The Supreme Court held (p. 146 of 290 U.S., 54 S.Ct. at 114) "a defendant sued upon his individual debt may not avail himself for

this purpose of a demand against the plaintiff held in a fiduciary capacity." (Citations omitted).

To the same effect is the holding in *Friedman v. Irving Trust Co.*, 164 Misc. 811, 300 N.Y.S. 51 (Mun.Ct.N.Y.C.1937) applying New York law. There, the Court held:

"The Huguenot Bank [depositary bank] acted only as plaintiff's collecting agent; the defendant, as subagent. The credit given by defendant to the Huguenot Bank was given after the suspension of the Huguenot Bank.... While the defendant claims it paid the proceeds of these checks to the Huguenot Bank, the actual fact is that the so-called 'payment' was nothing more than a mere accounting item on its books after the suspension of the depositing bank; this so-called 'payment' was neither a payment in currency nor an 'unconditional credit' of a character recognized in law (see sections 350–a, and 350–1, Negotiable Instruments Law) and, if anything, it would appear that what the defendant did do, in effect, was to reduce on its own books an indebtedness due to it from the Huguenot Bank.

\* \* \* \* \* \*

By the express terms of section 350–a of the Negotiable Instruments Law, defendant was the subagent of the plaintiff; the funds in question, upon collection by the defendant, were a trust fund for the benefit of the plaintiff."

Within § 350–a of the New York NIL, Bancec has never received the proceeds of the sight draft in "actual money." There is no showing that it ever received an "unconditional credit." In *In re Bank of United States*, 243 App.Div. 287, 277 N.Y.S. 96 (1st Dept. 1935) it was held that:

"The term 'unconditional credit,' although frequently recurring, is nowhere defined throughout article 19–A of the Negotiable Instruments Law (section 350, *et seq.*). That article, commonly known as the Bank Collection Code, in many respects has revolutionized the ancient principles pertaining to the collection of

commercial paper by banks. .... Construing together all the provisions of that article, the term 'unconditional credit' can only mean a credit which may not be withdrawn, even if it is eventually found that the item for which it is given is not collectible. It imports a credit which is not 'revocable' under section 350–a, nor 'provisional' under section 350–b."

█ Recently in *Fuller v. Fasig-Tipton Co.*, 587 F.2d 103, 106 (2d Cir. 1978), the Court of Appeals held that "one dealing with an agent for a disclosed principal may not set-off the agent's personal indebtedness against amounts due the principal." The stipulated facts, while showing that the draft was deposited by Banco Nacional for collection, does not state whether the agency relationship was known to Citibank. Probably such knowledge can be inferred from all the facts, but if not, Citibank was aware of the statutory presumption and had no factual knowledge indicating otherwise. Accordingly, Citibank here cannot discharge its obligation to Bancec by setting-off against Bancec the indebtedness to it of Banco Nacional as collecting or depositary bank with respect to the sight draft which is the subject of plaintiff's claim.

Rather, the Court will look to the realities of the situation, which justify regarding Bancec and its successors in interest the same as Banco Nacional or the Cuban Government for these purposes, in accordance with the rule of *Banco I, Sabbatino* and *Farr,* discussed *supra,* pp. 418–419.

No factual or legal basis is perceived to distinguish between the one Government wholly owned bank, Banco Nacional, on the one hand, and the other Government wholly owned bank, Bancec, on the other hand. The law creating Bancec describes it as "an official, autonomous, credit institution for foreign trade with full juridical capacity and capital of its own." This view of Bancec is not controlling on the Court. Under all of the relevant circumstances shown in this record, including the Stipulated Facts, it is clear that Bancec lacked an independent existence, and was a mere arm of the Cuban Government, performing a purely governmental function. The control of Bancec was exclusively in the hands of the Government, and Bancec was established solely to further Governmental purposes. Moreover, Bancec was totally dependent on the Government for financing and required to remit all of its profits to the Government.

While analogy to American institutions is of slight value, Bancec's complete financial dependence on the Cuban Government distinguished its situation from that of the Tennessee Valley Authority ("TVA"), regarded by plaintiff as being analogous to itself. The TVA has far greater financial independence, including the authority to issue bonds to finance its projects, subject only to prior approval of the Secretary of the Treasury, and less direct government control of its management, 16 U.S.C. § 831n–1–n–4. Bancec, in its relationship to the Government, seems closer to the now defunct Reconstruction Finance Corporation ("RFC") and its subsidiaries, which on numerous occasions were held to be an agent or arm of the United States Government, and shared in the privileges, responsibilities and immunities of that Government. See, *e. g., Keifer & Keifer v. RFC,* 306 U.S. 381, 59 S.Ct. 516, 83 L.Ed. 784 (1939). Of course cases involving American governmental agencies are of slight value as precedent here; at most they support an *a fortiori* argument.

Also of slight weight are reported cases in American courts decided before January 21, 1977 involving agencies and instrumentalities of foreign countries, most of which have been resolved factually according to the degree of independence of the corporate entity. *United States v. Deutsches Kalisyndikak Gesellschaft,* 31 F.2d 199 (S.D.N.Y. 1929); *Coale v. Societe Co-Operative Suisse Des Charbons, Basle,* 21 F.2d 180 (S.D.N.Y. 1921); *Ulen & Co. v. Bank Gospodarstwa Krajowego,* 261 App.Div. 1, 24 N.Y.S.2d 201 (1940). Also inapposite are cases in which private corporations were continued to be treated as such, notwithstanding acquisition by government of stock ownership of those corporations. See, *e. g., Bank of the United*

*States v. Planters' Bank of Georgia*, 22 U.S. 904, 9 Wheat. 904, 6 L.Ed. 244 (1824); *Ballaine v. Alaska Northern Ry. Co.*, 259 F. 183 (9th Cir. 1919); *Panama R. Co. v. Curran*, 256 F. 768 (5th Cir. 1919).

■ Cases decided under the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1602–11, *e. g.*, *Yessenin-Volpin v. Novosti Press Agency*, 443 F.Supp. 849 (S.D.N.Y.1978); *Edlow International Co. v. Nuklerna Elektrarna Krsko*, 441 F.Supp. 827 (D.D.C.1977), provide support for our conclusion that Bancec is an instrumentality of the Cuban Government for purposes of this case. Bancec is not a mere private corporation, the stock of which is owned by the Cuban Government, but an agency of the Cuban Government in the conduct of the sort of matters which even in a country characterized by private capitalism, tend to be supervised and managed by Government. Where the equities are so strong in favor of the counter-claiming defendants, as they are in this case, the Court should recognize the practicalities of the transactions. Doing justice in the case should not be obfuscated or side-tracked by self-serving recitals in post-revolutionary statutes of the Cuban Government, undoubtedly drawn with litigation of this sort in mind. The Court concludes that Bancec is an *alter ego* of the Cuban Government.

Chase admits that it is indebted to Banco Nacional in the amount of $9,793,021.70, except to the extent that it is entitled to assert set-offs, in reduction of that amount. Citibank concedes and admits that it is indebted either to the Cuban Government, Bancec, the Ministry of Foreign Trade, Banco Nacional, Empresa Cubana de Exportaciones, or Cuba Zucar in the amount of $193,280.30, as a result of an accepted draft against its letter of credit to Bancec referred to above. This concession also is subject to the right of set-off.

There is also at issue whether these claims are entitled to accrue pre-judgment interest, and that question also applies to the counterclaims. The matter of interest is discussed *infra*, p. 448.

## VIII

### Legal Basis for the Counterclaims

The set-offs pleaded here arise generally out of the nationalization of the branch banks of Chase and Citibank in Cuba. On September 16, 1960, Citibank maintained eleven branch offices in Cuba, and Chase had four such branches. The organization and nature of the branches is described in greater detail below. Citibank had been engaged continuously in branch banking in Cuba since 1915 and Chase had been so engaged since 1925.

The first of Chase's claims arises out of the claimed confiscation on September 17, 1960 of its Cuban branches, said to be in violation of international law. Chase asserts that the Cuban Government was liable to it for the value of such property; and that the Government of Cuba and Banco Nacional as its wholly owned financial instrumentality are indistinguishable entities for purposes of the liability for the seized property. In addition, Banco Nacional took over, assumed control of and enjoyed all of the benefits of the assets and banking branches of Chase in Cuba, giving rise to an alternate theory based on implied contract.

Chase exercised a set-off for what it claims to be the value of the property of its Cuban branches, including good will and going business value so confiscated. It so advised Banco Nacional.

At about the same time, Chase was also acting as trustee for American investors owning leased railroad equipment in possession of two Cuban railroads under what are conceded to have been financing leases. The Cuban Government expropriated the railroads and their rolling stock on October 13, 1960, pursuant to Law No. 890, and has repudiated the obligations of the railroads to Chase as trustee for the equipment trust certificate owners. The resulting damages are claimed to be $4,073,497.00, also asserted here as a set-off.

With respect to all of their claims, Chase and Citibank each recognize that they cannot proceed affirmatively against plaintiffs in this action, or the Government of Cuba,

but are at most entitled to a full set-off. See *National City Bank v. Republic of China*, 348 U.S. 356, 75 S.Ct. 423, 99 L.Ed. 389 (1955); 28 U.S.C. § 1607(c).

Chase has pleaded the claims arising out of the loss of its Cuban banking branches separately on alternative theories of liability, and has also asserted separately its counterclaims arising out of the railroad equipment.

Banco Nacional has defended in accordance with what may be characterized as at least five separate theories. These are: (1) Banco Nacional is a separate entity from the Government of Cuba and not liable for the obligations of the Cuban Government for the value of American property in Cuba which was confiscated; (2) Even if the Cuban Government and Banco Nacional are indistinguishable entities, Chase's claims arising out of the expropriation of the Cuban branches and credits located in Cuba are not actionable here by reason of the doctrine of sovereign immunity; (3) The claims against the Government of Cuba insofar as they concern assets and credits specifically located in Cuba are barred by the Act of State doctrine; (4) The expropriation or nationalization of Chase's Cuban branches and the seizure of the leased railroad equipment by the Cuban Government were not violations of international law, and did not give rise to a claim against the Cuban Government by Chase for the value of such property; and (5) The claims of Chase in its capacity as trustee for the value of the confiscated railroad property, to which Chase held title as trustee for others, cannot be asserted as a counterclaim or set-off in this lawsuit because they violate the "opposing party doctrine" developed in cases construing Rule 13(b), F.R. Civ.P.

█ Insofar as the Chase branch banks are concerned, the liability theory asserted by Chase in this litigation has already been validated in the companion Citibank litigation. See, *Banco I*, 270 F.Supp. 1004, 1006, 1010 (S.D.N.Y.1967, *on remand*, 478 F.2d 191, 193–94 (2d Cir. 1973). See also, *National City Bank v. Republic of China*, 348 U.S. 356, 75 S.Ct. 423, 99 L.Ed. 389 (1955). For the reasons stated in *Banco I*, Chase can set-off the full value of its branches and their assets in this lawsuit, and little purpose will be served in a further or additional analysis of the law concerning that liability. The Court recognizes that plaintiffs, which have briefed the issue comprehensively, seek to relitigate the correctness of *Banco I*, and they in turn recognize that this Court at trial level is precluded by the prior appellate pronouncements affirming in substantial part the decision of Judge Bryan in *Banco I*.

Basically that litigation stands for the purpose that Banco Nacional and the Government of Cuba are and were one and the same for all purposes of the litigation of this type of claim; and that in a suit by a foreign sovereign in our courts, the sovereign immunity doctrine does not bar a set-off up to the amount recovered by the foreign sovereign (see *National City Bank v. Republic of China, supra,* and cases cited in *Banco I*, 270 F.Supp. at 1006, 1007. Also, *Banco I* stands for the point that a claim of set-off is not barred under the circumstances of this case by the Act of State doctrine as enunciated in *Banco Nacional v. Sabbatino*, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964), because the set-off is authorized by the so-called Hickenlooper or Sabbatino Amendment to the Foreign Assistance Act of 1964, 22 U.S.C. § 2370(a)(2), as amended, 79 Stat. 658–59.

█ It is also a foreclosed issue that the taking of Citibank's Cuban branches by the Government of Cuba was in violation of international law because (a) Cuba failed to provide compensation for the taking; (b) the taking was a retaliatory measure against the United States citizens because of their Government's actions with respect to the Cuban sugar quota; and (c) the taking discriminated against American nationals in that Cuban owned, as well as Canadian and French private banks were not acquired by the Cuban State until much later.

In connection with our discussion of Act of State, it must be observed that Chase

and Citibank each have a "*Bernstein* letter" from the Office of the Secretary of State of the United States. *Bernstein v. N. V. Nederlandsche*, 210 F.2d 375 (2d Cir. 1954). The 5–4 decision of the Supreme Court at 406 U.S. 759, 92 S.Ct. 1808, 32 L.Ed.2d 466 (1972) in *Banco I* must be read to hold that the Act of State doctrine does not bar consideration of Citibank's off-set up to the amount of Banco Nacional's claim against Citibank. That conclusion applies with equal vigor to Chase's offsets here pleaded.

The plurality opinions in *Banco I* each found a different factor determinative of the question of when and under what circumstances the courts of this country may examine the legality of expropriations within its boundaries by a foreign government of property of American citizens. At least it may be inferred from *Banco I* that the *Bernstein* exception to the Act of State doctrine is regarded by Chief Justice Burger and Justices Rehnquist and White as having continued vitality. In the view of Justice Douglas, a foreign sovereign which brings suit in American courts waives its defense of sovereign immunity, and *pro tanto* waives the Act of State doctrine defense, insofar as concerns counterclaims up to the amount of the claim which the foreign sovereign asserts. This view is apparently codified in 28 U.S.C. § 1607(c). The Foreign Sovereign Immunities Act of 1976 was regarded by the court in *Yessenin-Volpin v. Novosti Press Agency*, 443 F.Supp. 849, 851 (S.D.N.Y.1978) as retrospective, and applicable to cases undecided on January 21, 1977. The Department of State has expressed the same view. See fn. 1 in *Yessenin-Volpin, supra. Banco I* suggests Justice Powell believes that the doctrine of the *Bernstein* letter exception implies a violation of the separation of powers, although he agreed that the Act of State doctrine should not apply to the facts of *Banco I.*

After deciding only the inapplicability of the Act of State doctrine, or alternatively the effectiveness of the *Bernstein* letter, the Supreme Court remanded *Banco I* to the Court of Appeals for the second time "for consideration of [Banco Nacional's] alternative bases of attack on the judgment of the district court." 406 U.S. at 770, 92 S.Ct. at 1814. Thereafter, the Court of Appeals unanimously affirmed the holding of the district court that Citibank was entitled to set-off, against Banco Nacional's claim, such amount as was due and owing from the Cuban Government as compensation for the seizure of Citibank's Cuban properties which had devolved into the ownership and control of Banco Nacional [478 F.2d 191 (1973)]. The opinion of Judge Hays in that regard may be held to constitute a holding that Banco Nacional and the Government of Cuba had acted as a single entity in the expropriation of Citibank's Cuban property and were one and the same for purposes of that litigation. It further held that the expropriations of the Citibank Cuban properties by Cuba and Banco Nacional violated international law, citing *Banco Nacional de Cuba v. Sabbatino*, 307 F.2d 845 (2d Cir. 1962), *rev'd. on other grounds*, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964) and *Banco Nacional de Cuba v. Farr*, 383 F.2d 166 (2d Cir. 1967), *cert. denied* 390 U.S. 956, 88 S.Ct. 1038, 20 L.Ed.2d 1151 (1968).

There is no reason why the Court should hold otherwise in the case of Chase's branches, and this Court regards these issues as having been conclusively decided. We note in passing that the point of *Banco I*, that a counterclaim by way of set-off, limited to the amount of a foreign state's principal claim as plaintiff, is not barred by the Act of State doctrine or by sovereign immunity, has been reaffirmed by the majority, concurring and dissenting opinions in *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976).

In sum, it follows from the foregoing that under international law Chase is entitled to compensation for its Cuban branches confiscated. Apart from the *stare decisis* effect of *Banco I* available to Chase here, it is to be noted that Professor Lillich in his authoritative work entitled *The Valuation of Nationalized Property in International Law* (1973), Vol. 2 at p. 121, n. 6, has written:

"The Cuban nationalizations 'based upon a totally illusory funding system and payable in bonds that were never printed' so patently violated international law that serious analysis was unnecessary."

As was also observed by the late Judge Bryan in *Banco I* (270 F.Supp. 1008–10), the acts of the Cuban Government exhibited the same retaliatory, discriminatory character as the measure condemned as violative of international law by the Court of Appeals in *Sabbatino, supra*, 307 F.2d at 845, 865.

Banco Nacional denies that compensation is required by international law, and suggests that the principle of compensation is no longer generally recognized. As the Supreme Court noted in *Sabbatino*, 376 U.S. at 428, 84 S.Ct. at 940, *et seq.*:

"There are few if any issues in international law today on which opinion seems to be so divided as the limitations on a state's power to expropriate the property of aliens.[26] [26. Compare, *e. g.*, Friedman, Expropriation in International Law 206–211 (1953); Dawson and Weston, "Prompt, Adequate and Effective": A Universal Standard of Compensation? 30 Fordham L.Rev. 727 (1962), with Note from Secretary of State Hull to Mexican Ambassador, August 22, 1938, V Foreign Relations of the United States 685 (1938); Doman, Postwar Nationalization of Foreign Property in Europe, 48 Col.L.Rev. 1125, 1127 (1948). We do not, of course, mean to say that there is no international standard in this area; we conclude only that the matter is not meet for adjudication by domestic tribunals.] There is, of course, authority, in international judicial[27] [27. See *Oscar Chinn Case,* P.C.I.J., ser. A/B, No. 63, at 87 (1934); *Chorzow Factory Case,* P.C.I.J., ser. A., No. 17, at 46, 47 (1928).] and arbitral[28] [28. See, *e. g., Norwegian Shipowners' Case* (Norway/United States) (Perm.Ct.Arb.) (1922), 1 U.N.Rep. Int'l Arb. Awards 307, 334, 339 (1948), Hague Court Reports, 2d Series, 39, 69, 74 (1932); *Marguerite de Joly de Sabla,* American and Panamanian General Claims Arbitration 379, 447, 6 U.N.Rep. Int'l Arb. Awards 358, 366 (1955)] decisions, in the expressions of national governments,[29] [29. See, *e. g.*, Dispatch from Lord Palmerston to British Envoy at Athens, Aug. 7, 1846, 39 British and Foreign State Papers 1849–1850, 431–432. Note from Secretary of State Hull to Mexican Ambassador, July 21, 1938, V Foreign Relations of the United States 674 (1938); Note to the Cuban Government, July 16, 1960, 43 Dept. State Bull. 171 (1960)] and among commentators[30] [30. See, *e. g.*, McNair, The Seizure of Property and Enterprises in Indonesia; 6 Netherlands Int'l L.Rev. 218, 243–253 (1959); Restatement, Foreign Relations Law of the United States (Proposed Official Draft 1962), §§ 190–195.] for the view that a taking is improper under international law if it is not for a public purpose, is discriminatory, or is without provision for prompt, adequate, and effective compensation. However, Communist countries, although they have in fact provided a degree of compensation *after diplomatic efforts, commonly recognize no obligation on the part of the taking country.*[31] [31. See Doman, *supra*, note 26, at 1143–1158; Fleming, States, Contracts and Progress, 62–63 (1960); Bystricky, Notes on Certain International Legal Problems Relating to Socialist Nationalisation, in International Assn. of Democratic Lawyers, Proceedings of the Commission on Private International Law, Sixth Congress (1956), 15.] Certain representatives of the newly independent and underdeveloped countries have questioned whether rules of state responsibility toward aliens can bind nations that have not consented to them[32] [32. See Anand, Role of the "New" Asian-African Countries in the Present International Legal Order, 56 Am.J. Int'l L. 383 (1962); Roy, Is the Law of Responsibility of States for Injuries to Aliens a Part of Universal International Law? 55 Am.J. Int'l L. 863 (1961).] and it is argued that the traditionally articulated standards governing expropriation of property reflect 'imperialist' interests and are inappropriate to the circumstances of em-

ergent states.[33] [33. See 1957 Yb.U.N. Int'l L.Comm'n (Vol. 1) 155, 158 (statements of Mr. Padilla Nervo (Mexico) and Mr. Pal (India)).]

The disagreement as to relevant international law standards reflects an even more basic divergence between the national interests of capital importing and capital exporting nations and between the social ideologies of those countries that favor state control of a considerable portion of the means of production and those that adhere to a free enterprise system. It is difficult to imagine the courts of this country embarking on adjudication in an area which touches more sensitively the practical and ideological goals of the various members of the community of nations.[34] [34. There are, of course, areas of international law in which consensus as to standards is greater and which do not represent a battleground for conflicting ideologies. This decision in no way intimates that the courts of this country are broadly foreclosed from considering questions of international law.]"

 As a district court, we are not free to overlook or neglect the interpretation of international law reiterated a hundred times over in the American courts simply because some other nations in public debate and diplomatic correspondence, have expressed a different view. While it is true that there is no international law, except to the extent that civilized nations having commercial intercourse with each other, agree that such law exists, and also agree to what it provides, this Court is bound by precedent and must recognize the precedential decisions of higher American courts unless and until withdrawn, set aside or reversed. These cases uniformly have found themselves to be in agreement with Restatement Second, Foreign Relations Law of the United States, §§ 185, et seq., to the effect that just compensation for a taking of the property of an alien must be made whether the taking in itself is lawful or not, and that such compensation must be adequate in amount, and paid with reasonable promptness.

Plaintiff's present ingenious argument concerning the measure of damages based on recent history. The argument is that, assuming international law requires payment of compensation for expropriated property, at best, all that is necessary is *partial* payment for the value of the property taken. This principle is claimed to be derived from an analysis of the history of recent lump-sum settlements which have been arrived at through diplomatic channels as a result of prior expropriations. See generally, R. Lillich and B. Weston, *International Claims; Their Settlement by Lump Sum Agreements* (1975). In a large number of such matters, as a result of diplomatic exchanges and in an effort to regularize relationships between the expropriating country and the United States or other "capital exporting countries," the expropriators have paid lump-sum settlements which the nation whose nationals lost their property has apportioned among claimants by its own internal legal procedures. Because this historical practice has been followed so frequently, plaintiffs argue that this is now an expression of the practice of nations, and therefor it represents international law. Professor Richard Lillich of the University of Virginia Law School is the editor of a three volume series entitled "The Valuation of Nationalized Property in International Law," published in 1972, 1973 and 1975, and herein referred to as Lillich I, Lillich II and Lillich III. He testified before Judge Bryan that the average of such lump-sum settlements ranges from 40 to 60% of the value of outstanding claims, and plaintiffs urge that the Court should extrapolate a rule from this recent experience and practice of nations to allow only 50% of the value of the expropriated property in this case as a set-off.

It must be noted first that the percentage of claims to be recovered is usually not known at the time that the lump-sum settlement is fixed. The lump-sum settlement is the product of diplomatic bargaining, and the allocation of that lump-sum settlement is usually determined by a Commission in the receiving country. The paying country

could not care less how the lump-sum settlement is allocated, and indeed, when the lump-sum settlement is agreed to, does not know with any finality what the receiving country will compute to be the total value of the expropriated property. The valuation of the expropriated property is no longer of concern to the paying country, if, indeed, it ever was. The percentage of claims satisfied is therefore fortuitous, and of no significance because it is affected by two unknowns: the relative bargaining power of the parties, and the unpredictible outcome of subsequent administrative proceedings to allocate the lump-sum payment among the recipients. True, it is very rare that 100% is recovered. This is because there would be no advantage to the expropriating nation to agree voluntarily to a lump-sum payment which would discharge *all* of the claims. Were it willing to do so, its ability to negotiate separately with the claimants or grant them access to its own courts, would probably bring in most of the claims at a lower value.

The trading nations now recognize that the day has passed when the capital exporting countries are willing to go to war to protect the most favored nation treaty rights of their nationals, nor do we now send in the Marines to protect American property. When an international crisis arises as a result of expropriation or some other unfairness practiced on American citizens abroad, the immediate anger soon cools, and the advantages of receiving some payment, however meagre, followed by renewed international trade on a regular basis, are usually perceived as more beneficial than holding out for the full and fair payment of each claim.

That only a small percentage of claims are recovered as a result of lump-sum settlement diplomatic agreements does not allow us to derive a principle of international law from that practice. In our domestic litigation we do not regard the terms of tort or contract damage settlements as establishing a rule of law. Over 90% of the private civil litigation in this country is probably settled by compromise prior to tri-al. Experience suggests that some plaintiffs get settlements larger than they deserve, and others far less than they are entitled to. We would not look to the percentage settlements in such cases to determine the law of torts or contracts; similarly, lump-sum settlement practice between nations desiring to restore international trade to its level prior to expropriation is an inappropriate source for deriving principles of international law concerning the compensation due for expropriated property. Such settlements are all influenced and distorted by the relative political and economic power of the parties, and their desire to regularize disrupted relationships, factors which are not relevant in attempting to set forth neutral principles of international law.

Before leaving this point it is worthy of note that plaintiffs' claims in this litigation are also in effect expropriated, since the payment of dollars to Cuba is now prevented just as effectively as the payment of dollars from Cuba. If there were any logic to the rule for which Professor Lillich's testimony was offered, it would apply equally to reduce plaintiffs' and defendants' claims. The Court rejects this contention and adheres to the concept that American citizens in Cuba are and were entitled to full and prompt recompense for their private property seized to be made in funds convertible to dollars. The Court will regard these set-offs as if they had been so converted and paid at the time of the seizure.

American decisional law is reflective of our nation's public policy. However, the courts are not the only institutions declaring public policy. Of more than passing interest is the declaration of Congress found in the legislative history to the "Rule of Law Amendment," § 301(d)(4) of Public Law 88–633, 78 Stat. 1013, adopted as an amendment to the Foreign Assistance Act of 1964 and found in 22 U.S.C. § 2370(e)(2), as extended, amended and presently in effect. This enactment is also called the "Hickenlooper Amendment" in memory of the late Senator Bourke Hickenlooper, its author, and is sometimes also referred to in

the literature as the "Sabbatino Amendment" because it intended to reverse the presumption in *Sabbatino*.

As initially passed by the House of Representatives on June 10, 1964, the Foreign Assistance Act of 1964 had no reference to the Rule of Law amendment. It was passed in the Senate and inserted as a result of Conference Committee work. The Committee on Foreign Relations of the United States Senate, by report dated July 10, 1964, states:

"The amendment is intended to reverse in part the recent decision of the Supreme Court in *Banco Nacional de Cuba v. Sabbatino* [376 U.S. 398, [84 S.Ct. 923, 11 L.Ed.2d 804] (1964)].... The Act of State doctrine has been applied by U. S. courts to determine that the actions of a foreign sovereign cannot be challenged in private litigation. The Supreme Court extended this doctrine in the *Sabbatino* decision so as to preclude U. S. courts from inquiring into acts of foreign states, even though these acts have been denounced by the State Department as contrary to international law."

The Congressional Record references contemporaneous with the adoption of this statute, show expressions of American public policy:

"Certainly the United States should not become an international 'thieves' market.'" Cong.Rec. p. 18937.

At Cong.Rec. p. 18946, August 14, 1964, it is stated:

"January 1, 1959 is the date of the coming to power of the Castro regime in Cuba and the beginning of the greatest series of illegal takings of American property in recent history."

The Legislative History includes at p. 22849 the remarks of Congressman Adair, in the House debate, explaining to the House why the Conference Committee had concurred in the Hickenlooper Amendment. He said:

"In our conference report we have said that federal and state courts are to be free in cases before them involving acts of foreign states to enforce principles of international law. *These principles, as applied by our courts, are to include the requirement for prompt, adequate and effective compensation in cases of expropriation.*" (Emphasis added).

Senator Hickenlooper's own extension of remarks at p. A5157 in the 1964 Appendix to the Congressional Record again use the words "prompt, adequate and effective compensation." The same Legislative History makes clear that § 620(e)(2), referring to principles of international law, including principles of compensation, refers back to § 620(e)(1), which defines the obligations of international law to include "speedy compensation ... in convertible foreign exchange equivalent to the full value" of the property expropriated.

Similarly, the statement of the President on October 17, 1964, when he signed Public Law 88–666, which authorized the Foreign Claims Settlement Commission to determine the amount and validity of claims of United States nationals against the Government of Cuba, noted that "a billion dollars worth of property of United States nationals was expropriated in total disregard for their rights, and that these unlawful seizures violated every standard by which the nations of the free world conduct their affairs."

█ In considering the violation of international law found in these cases, and the requirement for just, speedy and adequate compensation in convertible funds, which this Court finds to be international law as interpreted by American courts and the Congress of the United States, we should not become lost in revolutionary rhetoric. This is not a case where all private properties were expropriated at once, both from aliens and citizens, because a nation wished to experiment with socialist economic theory. Even the agrarian land reform plan in Cuba did not expropriate *all* the farms. Those which were more productive than a statutory standard were allowed to remain in private ownership and those below a certain size (1,005 acres) were also allowed to remain in private ownership. It is part of the law of nations that aliens of a

nation at peace with the host nation who are allowed to enter for the purpose of trade, bringing their goods, capital and lives under the protection of the host country, should not for purposes of such rights, be treated worse thereafter than a national of the host country would be treated.

The Court recognizes that here we are required to apply international law, not local law. See *Sabbatino, supra,* 307 F.2d at 860–61. And we should avoid identifying as a principle of international law, what is actually only a policy of our nation, and not a principle cherished by other countries, *id.* at 861. However, the domestic law of eminent domain imposed on the states by the Fourteenth Amendment to the U. S. Constitution, and apparently in effect against the states in principle since the American Revolution without regard to any state constitutional provisions [see *Wilkinson v. Leland,* 27 U.S. 627, 2 Pet. 627, 656, 7 L.Ed. 542 (1829)], is a satisfactory reference point for valuation principles. This is so because the principles it imports are neutral; neutral in the sense that our courts enforce them, even when it is against our own governmental interest to do so. Allowing the banks to recover going concern value at the time and place of the taking is fair, then, in the sense that this is the standard of valuation we live by, even when our own Government must make the payment. Most expositions of international law by American authorities assert that going concern value should be awarded. See, *e. g.,* Restatements (Second) of the Foreign Relations Law of the United States § 188 (1965); McCosker "Book Values in Nationalizations Settlements" quoted in Lillich II at p. 36. The Foreign Claims Settlement Commission decisions have allowed recovery for going concern value, although the statutory basis for valuing claims was required only to be that "most appropriate to the property and equitable to the claimant, including but not limited to (i) fair market value, (ii) book value, (iii) going concern value, or (iv) cost of replacement." Cuban Claims Act of 1964, 22 U.S.C. § 1643b(a).

## IX

*Chase's Counterclaim or Set-off as Equipment Trustee*

As noted earlier, Chase, as trustee for the benefit of American and other owners of equipment trust certificates, secured by financing leases of railway equipment seized by the Cuban Government in 1960, interposed counterclaims and set-offs in its capacity as such trustee. As of October 1, 1954, the railway equipment, title to which was vested in Chase as trustee, had been leased to the Cuban Northern Railways Company, and the Cuba Railroad Company. On October 13, 1960 the Cuban Government expropriated these assets. Chase claims the sum of $4,073,497.01.

The late Judge Bryan made an oral ruling on this point. He stated on the record on June 25, 1974 as follows (P. 2):

"As I have previously informed counsel, plaintiff's motion to dismiss the third and fourth counterclaims *have been granted,* and principally on the grounds that they are not assertable as counterclaims under Rule 13(b) of the Federal Rules of Civil Procedure and on other grounds which I will make clear when I do a comprehensive opinion covering this whole situation. That is number one." (Emphasis added).

Thereafter no party asked the Court for the finding required by Rule 54(b), F.R. Civ.P., which would have permitted entry of a final judgment denying all relief on Chase's claims as Railway Equipment Trustee, thereby making the issue separately appealable. Probably there was no basis for the necessary finding of "no just cause for delay" which would permit entry of such a partial judgment, and thereby balkanize the appeal.

This Court regards the matter as being not free from doubt, and worthy of consideration on an appellate level. But, the assigned judge having expressed himself to the effect that the motions to dismiss "have been granted," renders unnecessary any independent decision at this time by the writer. The rationale of Judge Bryan's conclusion as disclosed in his notes, was to the

effect that "Chase may not interpose counterclaims asserted in its fiduciary capacity as Railroad Equipment Trustee in an action brought against Chase in its individual corporate capacity." Judge Bryan regarded Rule 13(b), F.R.Civ.P. as a provision which "does not open the door to counterclaims by one who is not a party to the suit and against whom the plaintiff makes no claim." His bench notes, previously referred to as a "draft opinion" observe:

"Under Rule 13 a counterclaim may only be asserted against an 'opposing party' in the same action. The parties on each side of the counterclaim must be the same in name and capacity as those on either side of the main claim. A defendant can only assert a counterclaim against a plaintiff who has asserted a claim in that action against that defendant. See, *United States v. Timber Access Industries Co.*, 54 F.R.D. 36, 39–40 (D.Ore.1971) (dismissing a counterclaim which arose out of contracts between a logger and the United States Government in its proprietary role where the Government had sued not in its proprietary role, but as a trustee); *Chambers v. Cameron*, 29 F.Supp. 742 (N.D.Ill.1939) (in suit by trustees for the benefit of the trust, defendant cannot counterclaim against the trustees individually), see also, *Tryforos v. Icarian*, 49 F.R.D. 1 (N.D.Ill.1970); *Twardzik v. Sepauley*, 45 F.R.D. 529 (E.D. Pa.1968); *United States v. Lacy*, 116 F.Supp. 15, 21 (N.D.Ala.1953), *rev'd, on other grounds*, 216 F.2d 223 (5th Cir. 1954); *Higgins v. Shenango Pottery Co.*, 99 F.Supp. 522, 524–25 (W.D.Pa.1951). The same restriction applies to the party who advances the counterclaim. He may counterclaim only in the capacity in which the plaintiff has sought to impose liability upon him. See, *Durham v. Bunn*, 85 F.Supp. 530 (E.D.Pa.1949) (action against City tax official for wrongfully arresting plaintiff for non-payment of taxes—official may not counterclaim for recovery of the taxes since defendant was sued as an individual, and is counterclaiming in a representative capacity)."

Judge Bryan referred to Clark on Code Pleading (2nd ed. 1947) at p. 671 as follows:

"Where suit is brought by or against one in a representative capacity, as a trustee, executor, or administrator, the desirability of keeping accounts separate, and of avoiding possible prejudice to the party represented or unfairness or inconvenience to the party bringing suit, is thought to outweigh the policy of allowing the defendants to litigate all controversies in one suit."

And his notes continue:

"In the case at bar plaintiff Banco Nacional sought relief against Chase in its individual corporate capacity only. No claim was directed against Chase in its separate and independent capacity as Railroad Equipment Trustee. It is as if Chase as individual corporation and Chase as trustee are two separate litigants. Only Chase as a corporation may counterclaim against Banco Nacional because it is only this party who was named and is present in this action."

Judge Bryan's notes observed that:

"Chase argues that a trustee has a right to sue on a trust claim without joining his *cestuis qui trustent* and in so doing sues in his individual rather than in his representative capacity, citing *Thompson v. Whitmarsh*, 100 N.Y. 35, 2 N.E. 273 (1885); *Toronto General Trust Company v. Chicago, Burlington & Quincy Railroad Company*, 123 N.Y. 37, 25 N.E. 198 (1890), and other cases for this proposition, maintaining that New York law is applicable because under Fed.R.Civ.P. 17(b) a party's 'capacity' is governed by local law. The conflicts of law rules governing interpretation of the word 'capacity' in rule 17(b) are inapplicable to the opposing party doctrine of rule 13(b). See *Tolson v. Hodge*, 411 F.2d 123 (4th Cir. 1969). Under *Hanna v. Plumer*, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965), federal law governs this issue. From this Chase concludes that it is asserting the third and fourth counterclaims in its individual capacity and therefore it is the party opposing Banco Nacional. I cannot accept this conclusion. The cases cited by

[Chase] deal only with capacity for purposes of the right to sue. They are inapplicable to the 'opposing party' doctrine of rule 13, Fed.R.Civ.P.

Some courts make an exception to the opposing party rule where the benefits of any recovery by plaintiff in one capacity (that in which he is suing) will inure to plaintiff in his other capacity (that in which he is the subject of a counterclaim) and it might be thought that the same rule would apply to a defendant asserting the counterclaim where he will benefit personally from a counterclaim he asserts as a fiduciary or the representative.

In *Scott v. United States*, 354 F.2d 292 (Ct.Cl.1965), for example, the court allowed the United States to assert an unrelated counterclaim for a tax penalty against an individual partner in a suit on a contract brought by the partnership. The partnership consisted of only three partners and it was plain that any recovery by the partnership would inure to the benefit of the individual partners. The Court [in *Scott*] stated:

'The decisions disallowing counterclaims against plaintiffs as individuals in actions commenced by them in a representative capacity . . . do not require us to continue in the opposite position. Individuals suing as the representative of another or as a fiduciary do not benefit, in any immediate, personal way, from the judgments entered in those suits. But judgments rendered on partnership demands result in an immediate *pro rata* gain to the individual partners, since they actually own the claim in most senses. Inherent in the notion of ticking off the parties' debts and obligations to achieve an ultimate balance—the concept underlying the counterclaim rules—is the necessary condition that the parties against whom counterclaims may be lodged have a personal, beneficial interest in the claim declared in the complaint or petition. The rulings disallowing counterclaims against plaintiffs suing in a representative capacity rest on the assumption that such persons do not.'

354 F.2d at 300–01. In *Burg v. Horn*, 37 F.R.D. 562 (E.D.N.Y.1965), *aff'd.*, 380 F.2d 897 (2d Cir. 1967), the plaintiff, a stockholder and director of a close corporation, sued derivatively the remaining two director-stockholders for breach of fiduciary duty to the corporation. While recognizing the general rule that a stockholder suing derivatively is not subject to personal counterclaims, the court held that a counterclaim against the plaintiff in her personal capacity was proper under the circumstances of the case. In substance, the suit was 'to determine the rights of the three individual parties against one another.' 37 F.R.D. at 563. The derivative form of the suit was less important than the fact that the recovery would have inured to plaintiff's benefit individually.

However, [here] defendant Chase has no beneficial interest in the third and fourth counterclaims. It holds bare legal title as trustee, nothing more. The beneficial interest in the railroad equipment resides not in Chase but in the individual certificate holders, and it is they and not Chase who are the parties opposed to Banco Nacional in these counterclaims.

Chase will not suffer liability to the certificateholders by failing to collect any sums from Cuba. Section nine of Article VI of the 1954 Trust Agreement provides that the trustee 'shall not be answerable for any act or omission to act unless the same shall happen through its own negligence or willful default.' Although in theory a failure to assert a counterclaim here might have qualified as 'negligence' or 'willful default,' it is apparent at this point that Chase has done all it could under the circumstances to attempt to recover for the bondholders, [as it cannot presently acquire *in personam* or *quasi in rem* jurisdiction over the Government of Cuba for purposes of a plenary action in any court now open to it].

[Chase's] contention that principles of equity require that the third and fourth counterclaims be allowed here is equally unpersuasive. *National City Bank of N.*

*Y. v. Republic of China*, 348 U.S. 356, 75 S.Ct. 423, 99 L.Ed. 389 (1955), does not support that position. The *Republic of China* case merely held that a foreign sovereign who sues in our courts waives immunity on counterclaims [based on the subject matter of a sovereign's suit *Id.*, 364, 75 S.Ct. at 428]. It does not waive rights that any individual litigant in our courts would otherwise have, including the right to object to the assertion against it of a counterclaim in violation of the opposing party doctrine. It simply waives to a limited extent its right to object to a counterclaim on the ground of sovereign immunity.

Having failed to meet the requirements of the opposing party rule or fall within the exceptions to it, Chase maintains that the modern trend is to disregard 'such subtle niceties of pleading.' See *Aldens, Inc. v. Packel*, 524 F.2d 38, 50–51 (3d Cir. 1975), *cert. denied*, 425 U.S. 943, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976) (in action by out-of-state retailer against state Attorney General challenging constitutionality of Pennsylvania Goods and Service Installment Sales Act, lower court's dismissal of counterclaim by Attorney General for declaratory judgment and injunction on ground that cause of action belongs not to the Attorney General but to the Commonwealth was erroneous); *Moore-McCormack Lines, Inc. v. McMahon*, 235 F.2d 142, 144 (2d Cir. 1956) [in petition by shipowner for exoneration from or limitation of liability arising out of the sinking of vessel, wherein administrators of estates of officers who had lost their lives in the sinking, filed claims, shipowner can interpose cross-libels for indemnity on the theory of negligence against the administrators]; 1A Barron & Holtzoff, Federal Practice & Procedure § 398, at 607–08 (Wright ed. 1960); Wright, Federal Courts, 349–50 (2d Ed. 1970). Defendant seeks wholesale abrogation of the opposing party doctrine as a limit on permissive counterclaims under rule 13(b). The cases cited above relate to narrow fact situations not duplicated by the case at bar.

Ultimately, Chase falls back on the argument that unless the third and fourth counterclaims can be asserted in this suit, Cuba will escape liability for those claims because sovereign immunity bars a separate action by Chase or the bondholders against Cuba for the seized railroad equipment. In furtherance of what is considered sound principles of moral responsibility for the expropriation of private property, Chase urges that these counterclaims be made a part of this action. What Chase really questions is the soundness of our rules of law which grant sovereign nations, in some instances, immunity from suit and which here operates to bar an independent action by the certificateholders against the Cuban Government. Whatever the merits of the position may be, it is not open to this court to change a rule established by the Supreme Court long ago. *The Schooner Exchange v. McFaddon*, 11 U.S. 116, 7 Cranch 116, 3 L.Ed. 287 (1812). To hold otherwise would allow Chase to circumvent the sovereign immunity rules by subjecting the Cuban Government to claims by way of setoff which Chase could not assert directly. While we may not approve of the confiscatory action taken by the Cuban Government, this is not a reason to dilute that Government's rights by expanding the scope of permissive counterclaims."

Judge Bryan declined to reach the issue presented by Banco Nacional's contentions that the "counterclaims should be dismissed because, if they state a claim for relief at all, that claim runs against the Republic of Cuba, but not against Banco Nacional."

Since Judge Bryan did not finally complete his work in this matter, we believe further discussion of the point might be of assistance to the parties and the Court of Appeals. The reform movement in rules of pleading and practice killed off much of the niceties in issues affecting capacity by which the 19th century bar was bemused. Thereby, the issue of what counterclaims or set-offs could be pleaded lost much of its vigor and interest. This is essentially a diversity case, to which New York substan-

tive law should be applicable, and, if outcome determinative, New York adjective law likewise. *Guaranty Trust Co. v. York*, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945). In most domestic litigation it is of no serious importance if a counterclaim or set-off cannot be asserted, because the party who is prevented by some nicety of pleading or practice rules from asserting his counterclaim or set-off can usually bring a plenary action in his differing capacity, and indeed at least prior to *Schaffer v. Heitner*, 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977), such a party defendant could, under the rubric of *Harris v. Balk*, 198 U.S. 215, 25 S.Ct. 625, 49 L.Ed. 1023 (1905) attach the plaintiff's very claim, in the jurisdiction in which plaintiff was litigating, and gain *quasi in rem* jurisdiction to the extent of that claim, in that district, to support a plenary action. The actions could usually be consolidated for trial, and the whole issue thrashed out together even if pleading niceties prevented a counterclaim or set-off being pleaded because of differing capacities. So the problem seldom arose. Such practical resolution of counterclaims held in a different capacity is not open to Chase in this case because with limitations not here relevant, Banco Nacional is immune, as an instrumentality of the Cuban Government, from suit in this District or in the state courts, except to the extent that a set-off can be pleaded as an affirmative defense. Because of the ready availability of a plenary lawsuit in lieu of the counterclaim which would have been permitted but for the difference in capacity, the likelihood that an issue of mutuality of set-off would be litigated today in this jurisdiction under any other circumstances is remote.

Set-offs are and have historically been favored in New York both by statute and by general principles of equity. See *Beecher v. Vogt Manufacturing Co.*, 227 N.Y. 468, 125 N.E. 831 (1920); *Morris v. Windsor Trust Company*, 213 N.Y. 27, 106 N.E. 753 (1914). *Getlan v. Hofstra University*, 41 A.D.2d 830, 342 N.Y.S.2d 44 (1973) and § 3019(a) of the New York CPLR. In *Beecher*, then Judge Cardozo held, in a case where a plaintiff sued in a fiduciary capacity, that any set-off raised by defendant must be a claim against the plaintiff in its same fiduciary capacity, and not against the plaintiff in his individual capacity, stating "[d]ebts, to be applied against each other, must be mutual . . . to be mutual they must be due to and from the same persons in the same capacity." *Beecher* at 473, 125 N.E. 831. This conclusion is in keeping with the well-established rule in New York that an individual or corporation may have two wholly distinct capacities as a fiduciary, and as a personal, or corporate entity in its own right. *Leonard v. Pierce*, 182 N.Y. 431, 75 N.E. 313 (1905). See also, New York EPTL, § 11–4.1, effective September 1, 1967, but considered to be declaratory of existing law.

The principle limiting the use of set-offs appears to apply under New York law in the converse situation where an individual attempts to employ a personal claim to off-set a claim against him in his fiduciary capacity. Thus, it has been held that a defendant who holds a personal judgment against the plaintiff cannot use that judgment as a set-off if the plaintiff sues defendant in a fiduciary rather than a personal capacity. *Morris v. Windsor Trust Co., supra; Weeks v. O'Brien*, 25 App.Div. 206, 49 N.Y.S. 344 (1898); *Hoschek v. National Surety Co.*, 139 Misc. 683, 248 N.Y.S. 203 (App. Term 2d Dept. 1930).

If a defendant were permitted to reduce his own personal liability by the use of claims he owned on behalf of a trust, this might lead to a violation of his duties as trustee, particularly if the trustee were in a financial condition where his duty to the beneficiaries of the trust required him to assert the set-off, but upon prevailing it lacked funds in its individual corporate capacity to pay into the trust account the amount set-off. Part of the intellectual underpinning of the rule, if it has any, is that a fiduciary may not use the subject matter of his trust for his own profit, and the further rule that he must keep the trust property separate from his own personal property. See New York EPTL § 11–1.6(a) (effective September 1, 1967, but declaratory of existing New York law).

Another issue presented with respect to Chase's trustee claims is whether the law of New York applies or whether the right to assert a set-off or plead a counterclaim in a diversity case should be controlled by federal procedural rules. Rule 17(b), F.R.Civ.P. requires that the capacity of a person to maintain a suit in a representative or fiduciary capacity must be "determined by the law of the state in which the district court is held." See *Cooper v. American Airlines*, 149 F.2d 355 (2d Cir. 1945). This suggests that Chase's right to assert the counterclaim in its capacity as trustee depends on applicable New York law. Probably the law of New York, as indicated above, does not permit a person to assert claims that he holds as a fiduciary as an off-set against claims directed at him in his personal capacity. However, Rules 13(a) and (b), F.R. Civ.P. do not appear on their face to restrict the setting up of a counterclaim or off-set by a defendant simply because the counterclaim or off-set belongs to him in a different capacity. Generally, under the doctrine of *Hanna v. Plumer, supra*, once the district court determines that it has jurisdiction over the parties, and that the parties have capacity to sue and be sued, the Federal Rules of Civil Procedure should be applied to procedural matters. *Tolson v. Hodge*, 411 F.2d 123 (4th Cir. 1979); *Avondale Shipyards, Inc. v. Propulsion Systems, Inc.*, 53 F.R.D. 341 (E.D.La.1971); *G & M Tire Co. Inc. v. Dunlop Tire & Rubber Co.*, 36 F.R.D. 440 (N.D.Miss.1964). Despite its general language, the facts in *Tolson* do not involve the assertion by a fiduciary of claims held in such capacity to reduce the fiduciary's own personal liability to the opposing party. In *Tolson* plaintiff sued an administratrix who counterclaimed in her fiduciary capacity only. In the case of Chase, there is probably not the same logical relationship between defendant's claim as trustee against plaintiff and plaintiff's claim against defendant in its own corporate capacity such as Rule 13(a) would require to be pleaded as a set-off to reduce the trustee's own personal liability. In this case, defendant's set-off claims arose out of the same general occurrence as the claims

asserted by plaintiff, that is to say, the Cuban Revolution, but the defendant's set-off claims here to not bear the logical relationship to the plaintiff's claims such as to make the set-offs compulsory under Rule 13(a). See *Harris v. Steinem*, 571 F.2d 119 (2d Cir. 1978).

■ Defendant's arguments for allowing the set-off, stated in terms of "policy considerations" and "substantial justice," are tempting arguments, but if allowed, may be productive of vast mischief. While we would seek to do justice in the matter, we cannot part from our established procedures and rules in order to do so. It is purely fortuitous that Chase, against which plaintiff has asserted a claim, happens to be the trustee of these two equipment trusts. If the trustee were a different entity, or if Chase did not happen to be indebted to Banco Nacional, no set-off would be available. Presumably, other Cuban equipment trusts held by other American trustees are not so fortunate. If the set-off were permitted in this case, the next logical step is to permit an assignee or person who has purchased a Cuban claim, to assert a set-off. This would bring forth a brisk and undesirable trading in claims against Cuban corporations or the Cuban state, to become available for purposes of set-off, and where will it stop?

When we focus on the question of trustee identity, evolution of the law concerning trusts has left an unclear result. At common law, a trustee held legal title to the trust property in his own name and could sue in his own name for an injury to the trust property. *Toronto General Trust Co. v. Chicago, Burlington & Quincy Railroad Co.*, 123 N.Y. 37, 25 N.E. 198 (1890). A single person acting as trustee of two trusts could not litigate against himself at common law, but would have to resolve any such dispute either by resigning and permitting a successor trustee to litigate, or by resort to equity. In *United States Trust Company of New York v. Bingham*, 301 N.Y. 1, 92 N.E.2d 39 (1950) the lower courts had allowed a trust company to appear in a proceeding for the judicial settlement of

fiduciary accounts of its sole trusteeship of the Payne trusts, against which the Estate of one Ledyard, of which the same fiduciary was executor, had a claim for trustee commissions earned by Ledyard during his lifetime, and to litigate that issue against itself. Distinguishing *Fisher v. Banta*, 66 N.Y. 468 (1876), which held that the administrator of an estate cannot account to himself as executor of a deceased beneficiary of the same estate, the New York Court of Appeals affirmed. In *Bingham* the Trust Company was represented in its separate capacities by two different attorneys. The dissenting opinion of Judge Desmond states the case simply:

"The simple, unavoidable question here is as to whether the Trust Company, as claimant (for the Ledyard estate) could, alone and to the exclusion of anyone beneficially interested in the Ledyard estate, carry on a litigation against the alleged debtor (the Trust Company itself, as Payne trustee) and get a judgment therein which would conclude the Ledyard estate and its beneficiaries. I do not see how it is possible to give any but a negative answer to that question.

'It is elementary that the same person cannot be both plaintiff and defendant at the same time in the same action. It is incongruous that the same person should direct and conduct both the prosecution and the defense of the same suit, no matter in what capacity he may appear. * * * And the rule has been applied where the same person sues and defends in different capacities.' (*Globe & Rutgers Fire Ins. Co. v. Hines*, 273 F. 774, 777 [C.C.A.2d], *certiorari denied* 257 U.S. 643, 42 S.Ct. 54, 66 L.Ed. 413)."

See also, *Trustees, etc. v. Stewart*, 27 Barb. 553 (S.Ct. Cayuga Co. 1858).

On the same day that the Court of Appeals decided *Bingham*, but presumably without foreknowledge, Mr. Justice Eder of the New York Supreme Court, New York County, considered an unusual fact situation, in *Krooss v. Maue*, 198 Misc. 397, 97 N.Y.S.2d 415 (1950). In an action concerning real property, Elise Krooss, as executrix of a decedent's estate, had sued her son John H. Krooss and her son-in-law, Peter H. Maue individually and as representative of another decedent's estate. Following the death of Elise Krooss, John H. Krooss, one of the co-defendants in his individual capacity, became successor executor and sought to be substituted as plaintiff and to continue the litigation. Justice Eder held as follows:

"The application presents an important question, *viz.*, whether the movant, who is a defendant in this action in his individual capacity, can now continue the action in a representative capacity as successor to his mother against himself and his co-defendant who is his deceased sister's representative.

\* \* \* \* \* \*

If the application is granted, this, in effect, would permit the movant John H. Krooss to be a plaintiff in a representative capacity, and a defendant in an individual capacity in one and the same case. Such a situation is an anomalous one and, to permit such a procedure, is irregular and may result in prejudice to the rights of other parties, and create confusion. In New Jersey, where a comparable situation was presented—*Shippee v. Shippee*, 122 N.J.Eq. 570, 195 A. 728, the court took the position that a man cannot, in his individual capacity, sue himself in his capacity as executor. The rule must similarly apply to a converse situation.

In 24 Corpus Juris, § 2043, p. 812, the rule is stated as follows: 'The courts do not permit a party to be both plaintiff and defendant in the same action and therefore it is not competent for a personal representative acting in his representative capacity to sue himself in his individual capacity. The rule is not altered by the fact that his co-representative is joined with him as co-plaintiff, but the pleading may be amended by striking out his name as co-plaintiff. On the other hand, a personal representative cannot maintain a suit in his individual capacity against himself in his representative capacity.' See, also, 34 C.J.S. Executors and Administrators, § 689.

This is a logical conclusion and one with which I am in accord and, in consequence, I am unable to see that the same person, by the addition of a designation, can thus overcome the prohibition which otherwise exists. In other words, *a person, by acting as executor or trustee, does not thereby become a separate entity like a corporation; he continues to be, and is, the same natural person as he is in his individual capacity.*" (Emphasis added).

When *Krooss* reached the Appellate Division on October 17th of the same year, the order was unanimously reversed, without citation of *Bingham*. The First Department held by memorandum (100 N.Y.2d 226):

"There is no conflict of interest between appellant in his individual and representative capacities. On the pleadings his position as defendant is identical with plaintiff's position and the contest is between the Krooss Estate, now represented by appellant as administrator, and respondent Maue. It is proper under the circumstances for appellant to be substituted as plaintiff."

Later, in *Bederman v. Moskowitz*, 139 N.Y.2d 352 (Sup.Ct. Kings Co. 1955) the court, citing *Krooss*, but making no reference whatever to *Bingham*, held:

"A party may not in his individual capacity sue himself in his representative capacity where his position is inconsistent and hostile with his representative capacity. The court is not unmindful of the case of *Krooss v. Maue*, 198 Misc. 397, 97 N.Y. S.2d 415, which held that the one who is a defendant in an individual capacity cannot continue the action in a representative capacity as successor to another against himself and his co-defendant, which was reversed by the Appellate Division, 277 App.Div. 973, 100 N.Y.S.2d 226. The distinction between the matter on hand and the *Krooss* case lies in the fact that the latter case, as noted by the Appellate Division, there was no conflict of interest between the defendant in his individual and representative capacities. Such is not the situation here. Accord-

ingly, the motion is denied, with leave to renew at such time when a person other than the plaintiff has qualified as a representative of the estate of the deceased."

*Bederman* was an action to recover damages for conversion of jewelry owned by the plaintiff, entrusted to her sister, now deceased, who had been defendant's wife. Later, in *Murphy v. Christoffers*, 55 Misc.2d 879, 286 N.Y.S.2d 939 (Dist.Ct. Nassau Co. 1968) citing *Krooss* but not *Bingham*, a father, as guardian *ad litem* for an infant plaintiff, was permitted to maintain litigation against his wife and another as co-executors of a decedent who had a claim against the decedent. The Court held that notwithstanding the common law unity of interest which the parents had as guardians and custodians of the infant plaintiff, there was no conflict of interest between the plaintiff, appearing by a guardian *ad litem*, in a common interest with the guardian's wife on the one side, against the deceased defendant's estate of which the guardian's wife was co-executrix, on the other.

The most that can be derived from the foregoing cases, and the *Bingham* case, *supra*, which involved an *inter vivos* trust instrument, creating an express trust of the same nature as that which Chase accepted for the benefit of the railway equipment investors, is that the New York trustee may well have become an entity separate from himself, so that he can sue himself by separate counsel, and that the rule of *Toronto General Trust Co., supra* no longer has validity. If this is true, then it may be concluded that Chase as legal title holder could no longer sue in its own name in New York as a matter of capacity to sue, and accordingly it cannot sue plaintiff in that fashion here, nor can it plead the claims to which it holds legal title as trustee as a set-off.

## X

*The Cuban Branches as an Entity*

The Cuban branches were not separately incorporated. By reason of American law, neither Chase nor Citibank could have owned and operated its Cuban branches as

subsidiary corporations organized under Cuban or American law. See 12 U.S.C. § 601. Nor could these national banks have placed at risk in Cuba all of their general assets wheresoever located. *Id.* On the books of the home office the branches were treated collectively as a separate enterprise from the domestic banking operations. The books of account showed the total capital invested in or allocated to the Cuban operations, and a daily balance was struck showing "indebtedness" between the Cuban operation and the bank as a whole, as if the Cuban operation were a separate enterprise. This was in accordance with customary foreign banking operations of American banks.

It was also apparently in compliance with Cuban banking regulations. For example, Exhibit C4 shows that Chase forwarded to Banco Nacional bonds amounting to $1,978,-000 to create "capital and reserve" in accordance with Article 105 of Cuban Law No. 13 of December 23, 1948, establishing Banco Nacional, and that this figure was derived as representing 5% of demand deposits in Chase's Cuban operations as of April 27, 1950. The minutes of the directors of Chase at a meeting held on October 6, 1937, assigned $100,000 to the capital of Chase's Havana branch.

Similarly, minutes of the board of directors of Citibank on December 31, 1924 show authority to open a branch bank at Havana, "and that this corporation use in connection with its banking business in the Republic of Cuba, an amount of capital not exceeding $100,000."

Between the commencement of banking in Cuba in 1925, and 1937, Chase had caused its Cuban branch to "borrow" from the main office in New York, those funds, which together with deposits, permitted the Cuban branch to conduct its day to day operations. In effect, the branch in Havana was permitted to "overdraw" its checking account in dollars with the main office, so that the reflection on the books at the main office in New York would be a negative balance in the Havana branch checking account. This appears from the deposition of Michael P. Esposito, Jr., taken April 10, 1974, Exhibit G. This practice continued until the capital loan of 1937, made from the head office to the Cuban branch as "allocated capital" mentioned above. Additional sums were allocated in the 1950's to other Cuban branches in accordance with resolutions of Chase's board of directors.

Chase's Cuban branches always had resident officers, but never had a separate board of directors. These officers were always selected by the board of directors in New York. By resolution of the Bank's board of directors, branches were established as follows: Havana, January 12, 1925; Vedado, February 1, 1951; Marianao, April 2, 1951; and Amistad, June 1, 1954. Capital at $5,000 each had been assigned to the Vedado, Marianao and Amistad branches from the New York office at about the time they opened. To permit the Bank's branches in Cuba to have adequate funds for their day to day operations, credit slips were also issued, including a credit slip on April 9, 1951 for $1,978,452.45; another on December 22, 1955 for $50,000; another on December 13, 1956 for $167,000; and one on October 24, 1957 for $1,804,547.55.

We see, therefore, in the case of both banks, that the branches were operated as a separate enterprise for bookkeeping purposes, and treated as a separate "profit center," making payments to and receiving payments from their head office in New York. Furthermore, prior to confiscation, the Cuban Government and Banco Nacional treated the Cuban branches as distinct entities independent of their head office for purposes of banking regulation and taxation.

Prior to the enactment of Law No. 13 of 1948, which established Banco Nacional, there was little statutory regulation of the banking business in Cuba. The commercial code required maintenance of a minimum legal cash reserve of 25% of deposit liabilities. For purposes of enforcing this code, the only liabilities considered were those of the Cuban branches, not of the entire bank. As noted above, when required to subscribe to Banco Nacional stock in proportion to

their shares of the deposits of all banks in Cuba, Chase and Citibank did so solely with reference to deposits in their Cuban branches. Just prior to confiscation, and at all prior times, Banco Nacional had recognized the obligations of the Cuban branches to repay to the head office such items as profits, overdrafts and amounts due with respect to letters of credit which the branches had caused the head office to open in New York in favor of Cuban businesses. Cuba had permitted remission of such amounts to New York along with other similar transactions except that the last two years profits were not remitted because of restrictions placed on foreign exchange.

The bank examination function was performed in Cuba by Banco Nacional. It recognized as valid the bookkeeping records of the banks, including the liability items on the financial statements shown as owed to the home office representing capital and reserves. Taxes imposed by Cuba on profits were related solely to the profits of the Cuban branches. The entire books of account of these national banks were also under the continuous supervision of the bank examiners employed by the Comptroller of the Currency of the United States. See, 12 C.F.R. §§ 4.2, 4.11.

While it is certainly true as a matter of law that "the branch in Havana could no more be indebted to the head office than the branch on Pine Street could be indebted to a branch on Broadway," (Mr. Rabinowitz, quoted from p. 16 of hearing held before me July 20, 1978), it remains true that the Cuban Government, the banks themselves, and the Controller of the Currency treated the Cuban branches at least for all value-related purposes, as independent banking enterprises. As such, the branches were amenable to sale or disposition, and as it turned out, they were amenable to confiscation without payment, all separately from the home office. The profits or losses of the Cuban branches were included in the consolidated annual reports to shareholders by each bank, except that unremitted profits in 1959 and 1960 were generally carried as unearned income on the balance sheets. For the last two years the profits had not

been remitted, solely for lack of foreign exchange remittance permits, although such permits were being routinely granted for ordinary commercial transactions regarded as helpful to the Cuban economy.

From the point of view of economics, the branches of the respective banks, each treated as a single enterprise, should be valued with the same effect as if each were an independent entity, or a subsidiary corporation. In valuation, we must look to the economic realities, which should not be distorted by reference to the legal theory under which the economic entity (branch bank) was conducted or formed.

The concept that the bank branches in Cuba are an independent economic entity has of course no bearing on the theory advanced by Chase that the book entries for the net debt of the branches to the home office form a bases for contending that this debt in effect was taken over, confiscated or assumed by Banco Nacional when the branches were confiscated. The damages to be recovered here by Chase as set-off cannot exceed the value of the asset in place at the time that it was taken, without adjustment for any chilling effect on its value resulting from the taking. This valuation question is discussed further below. Ordinarily, branches of this sort, which have been profitable for all or most of their history and have a going concern value, should be expected to be worth more than the total historic "debt" which they owe to the home office. But the historic amount of any such debt cannot in logic be taken as the value of what was expropriated.

## XI

*Valuation*

▮▮▮▮ Discussion of the valuation of the confiscated branches may begin with Judge Frank's admonition in *Commissioner of Internal Revenue v. Marshall*, 125 F.2d 943 (2d Cir. 1942), that we need to recognize:

"The eely character of the word 'value.' It is a bewitching word which, for years,

has disturbed mental peace and caused numerous useless debates. Perhaps it would be better for the peace of man's mind if the word were abolished. Reams of good paper and gallons of good ink have been wasted by those who have tried to give a constant and precise meaning. The truth is that it has different meanings in different contexts ...." 125 F.2d at 946.

A threshold question concerns whether the banks are entitled to compensation for the Cuban branches on a going concern basis, rather than merely at the value of the sum of the constituent parts. As a matter of principle it seems clear that the defendants are entitled to assert their set-off by valuation on a going concern basis. This conclusion follows because the Cuban Government expropriated the branches, including the assets, liabilities, customer lists and books and records, and continued to use them as a going banking operation in the name of Banco Nacional, with the same effect as if they had been merged with the domestic banking operations of Banco Nacional. This was done with the intention to run these branches as banks, as part of the national banking system. This is not the case where a going concern is taken over by an expropriating nation simply in order to liquidate it, nor is it the case where a host nation simply orders a particular business or type of business to cease operations. When a business is taken over to be operated as a going concern, the owner becomes entitled to compensation for the value of that business as a going concern. This result could follow on the theory that there was a contract implied in fact that Banco Nacional or the Cuban Government would pay compensation. Contracts implied in fact require the assent of the person to be charged, or conduct from which such assent may be inferred. *Grombach Productions, Inc. v. Waring*, 293 N.Y. 609, 59 N.E.2d 425 (1944); *Miller v. Schloss*, 218 N.Y. 400, 113 N.E. 337 (1916). Here, the statute on its face contemplated payment by the issuance of bonds, although such bonds were never issued. It is doubtful that the Cuban Government or Banco Nacional, the parties

charged in this case ever intended to fix the value and issue the bonds, or that they may be found to have "agreed" to compensate the banks for any of the branches seized. The statute required valuation by Banco Nacional as of the end of the year, but there is no evidence it ever did so.

However, the defendant banks may also recover on the theory that there was a contract implied in law, or a quasi-contract. A quasi-contract "is not a contract or promise at all. It is an obligation which the law creates, in the absence of any agreement, when and because the acts of the parties or others have placed in the possession of one person money, or its equivalent, under such circumstances that in equity and good conscience he ought not retain it, and which *et aequo et bono* belongs to another." *Miller v. Schloss, supra*, at 407, 113 N.E. 337. In order to recover under this theory, defendants must show that Banco Nacional or the Cuban Government was unjustly enriched at their expense, and that "... the circumstances were such that in equity and good conscience [Banco Nacional or the Cuban Government] should make restitution." *Chase Manhattan Bank, N.A. v. Banque Intra, S.A.*, 274 F.Supp. 496, 499 (S.D.N.Y. 1967); see also *Silberblatt, Inc. v. East Harlem Pilot Block*, 608 F.2d 28 (2d Cir. 1979). Having taken over these branches and their accounts, deposits and assets, and having thereafter operated the branches as branch banks for its/their own account, Banco Nacional and/or the Cuban Government are bound to make restitution on principles of quasi-contract, in addition to being so obligated under the principles of international law discussed *supra*, p. 429, *et seq.*

The applicable value will be that which our own Government would pay to a domestic corporation under our laws of eminent domain. This basic standard of valuation is market value, "what a willing buyer would pay in cash to a willing seller." *United States v. Miller*, 317 U.S. 369, 374, 63 S.Ct. 276, 280, 87 L.Ed. 336 (1943). That there are no willing buyers around, or that the property taken is not of a sort which is fungible or generally bought and sold, does

not detract from the validity of the theory nor prevent its application.

Distinguishable are those cases where only land upon which a business is conducted is taken, and where the business itself does not change ownership from private to public control. Where the owner of a business may remove it to another place, reestablish his business, carrying his good will with him, there will be no compensation for the damage to good will, or for the loss of any other intangible value that accrues when a business establishes itself as a "going concern." See *Banner Milling Co. v. State*, 240 N.Y. 533, 540–41, 148 N.E. 668, *cert. denied* 269 U.S. 582, 46 S.Ct. 107, 70 L.Ed. 423 (1925). The Supreme Court has decided similar cases, where a condemning authority has taken over a business and continued to operate it for its own benefit. In such cases, the business is generally valued as a going concern, including recovery for good will or going concern value. See *Kimball Laundry Company v. United States*, 338 U.S. 1, 8–20, 69 S.Ct. 1434, 1439–1445, 93 L.Ed. 1765 (1949); *City of Denver v. Denver Union Water Company*, 246 U.S. 178, 191–92, 38 S.Ct. 278, 62 L.Ed. 649 (1918); *City of Omaha v. Omaha Water Company*, 218 U.S. 180, 202–03, 30 S.Ct. 615, 619–620, 54 L.Ed. 991 (1910).

Notwithstanding the statutory provisions of the Cuban Claims Act of 1964, 22 U.S.C. § 1643b(a) quoted *supra*, p. 435, the customary practice of the Foreign Claims Settlement Commission, as explained by Professor Lillich, was generally to refuse recovery for good will, largely because of the problems of proving it. See Lillich I at 100–15. However, with the decision on the claim of *First National Bank of Boston*, FCSC Ann.Rep. 33 (1969), the Commission reversed this policy. Adjudications by the FCSC in connection with claims regarding the Cuban branches of Chase and Citibank, discussed *infra*, p. 449, did allow good will to the extent the existence of it could be shown.

A second issue which arises in valuing the Cuban branches is whether and to what extent the Court should take into account conduct of the Government prior to nationalization, which had a threatening or chilling effect on the value of the branches. As noted, the Cuban Revolution produced sweeping economic and social changes, which had a general debilitating effect on the Cuban economy. During this period the level of activity and the value of defendants' businesses in Cuba declined. This decline can be attributed generally to several causes, including: (i) increased stringency in currency controls which impeded international trade and trade with the United States, areas in which Chase and Citibank had enjoyed a competitive advantage over other banks in Cuba; (ii) the taking over by Interventors, appointed by the Cuban Government, of business properties belonging to Cubans who had fled the realm. These political functionaries naturally elected to do their domestic banking with Banco Nacional instead of Chase or Citibank; (iii) land reform, which eliminated the large private agricultural producers, some of which were American owned, and most of which had need for international banking services; (iv) general economic depression due to decreased tourism, decreased economic activity, hostile actions of the American Congress and State Department; and (v) just plain hard times.

There are numerous authorities to the effect that the prior depressing effect of the threat of nationalization by the nationalizing country are to be disregarded in fixing value of expropriated property. Authorities include the *Case Concerning the Factory at Chorzow*, P.C.I.J. Ser. A No. 17 at 47; Restatement (Second) of the Foreign Relations Law of the United States § 188 Comment b (1965); Lillich, "The Valuation of Nationalized Property by the Foreign Claims Settlement Commission" in Lillich I, pp. 95 and 97, n. 13; *Almota Farmer's Elevator and Warehouse Company v. United States*, 409 U.S. 470, 478, 93 S.Ct. 791, 796, 35 L.Ed.2d 1 (1973). The decisions of the Foreign Claims Settlement Commission accept this argument by using earnings figures from the pre-revolutionary period in Cuba. See, *e. g., Claim of First National City Bank*, proposed Decision No. CU 3835

(September 3, 1969). Claim of Intercontinental Hotels Corporation, Decision No. CU–4545 (April 13, 1970).

The Commentary to the Restatement suggests:

"So far as practicable, full value must be determined as of the time of the taking, unaffected by the taking, by other related takings, or by conduct attributable to the taking state and having the effect of depressing the value of the property in anticipation of the taking. This does not require, however, disregard of the effect on market values of the state's general power to regulate the use of property or the conduct of business operations." Restatement (Second) of the Foreign Relations Law of the United States, § 188 Comment b (1965).

The argument goes so far as to suggest that this approach to valuation is essential, lest the amount of compensation be left wholly in the power of the nationalizing government.

In opposition, plaintiffs make an argument which expresses reality. Plaintiff's counsel expresses a very telling analysis (p. 21 of post-trial hearing held July 20, 1978) to the effect that:

"[I]t is possible to pretend that there was no revolution. It is possible to pretend that the sugar quota was still in existence. It was possible to pretend that the casinos were still running in Havana, and that the tourist trade was still running in Havana and to say, well, ... in 1957 or 1958 they made a lot of money, so we will project that into an imaginary future. It is possible to do that."

And, we may add, it is possible to pretend that the propertied and professional classes had not fled the revolution; and that the successful plantations had not been extinguished by agrarian reform. All of these assumptions are possible to make, but they are not justified by reality.

It was not a violation of international law, of which these defendants have standing to complain, for Cuba to engage in agrarian reform. Indeed on its face, the Agrarian Reform Law does provide for compensation, although in fact no compensation was paid to American owners. Nor is it a violation for a nation to readjust its economy and change the methods of organizing its local and international trade. Many of the adverse effects on the value of the branch banks in Cuba did not arise from wrongdoing, or the chilling result of projected takings, as are contemplated by the rule suggested in the Restatement. On the facts of this case, we cannot attribute the entire downturn in the value of the branch banks to any improper chilling effect exerted by the Cuban Government on these banks prior to expropriation.

Investments in foreign countries where the political climate is unstable obviously present higher risks, as foreign investors must realize. It would be a novel theory indeed that holds a foreign nation liable to make compensation to foreigners solely for damage ensuing by reason of basic changes in the social contract, though they be radical changes. The right to effect such changes is an incident of sovereignty. It is apparent that the Cuban Government, or our own Government could take numerous steps which would have been detrimental to a business, without giving rise to any right of compensation on the part of that business. Even under our own Constitution, an outright ban on sale of a manufacturer's product, such as we experienced during National Prohibition, may be enacted, resulting in ruin to a business, but no right to compensation therefore would be recognized. See, e. g., *Mugler v. Kansas*, 123 U.S. 623, 8 S.Ct. 273, 31 L.Ed. 205 (1887); *Samuels v. McCurdy*, 267 U.S. 188, 45 S.Ct. 264, 69 L.Ed. 568 (1925) and cases therein cited.

Defendants, by asking the Court to disregard totally the depressing effect on their business of the events of 1959–60, seek compensation in part for the business losses they incurred as a result of those events. Defendants are entitled to compensation only if and to the extent that the events which led to those losses were actions of the Cuban Government in violation of interna-

**448**

tional law, typically including confiscation, and the chilling of the value of the asset prior to seizure which occurred when confiscation became a foreseeable certainty. There does not appear to be a legal basis to award compensation to defendants for that portion of their losses in the value of their businesses resulting solely from secular change in Cuba.

It would be inappropriate to project the profits of the Cuban branches prior to 1959 to value the underlying business, and accordingly the valuation must be computed based on circumstances as they existed shortly prior to the time the banks were taken over. Such value will be fixed, however, without regard to the retaliation foreseeable when the Soviet barter agreement was followed by the termination of the Cuban sugar import quota to the United States. Once confiscation of the American banks became foreseeable, they had no market value, and this is shown by the testimony of Citibank's expert witness, Morris Schapiro (Trial Tr., Jan. 12, 1977, pp. 494–509).

## XII

*Pre-judgment Interest*

Also at issue here is the question of whether the plaintiffs' claims, and the defendants' set-offs to the extent allowed, are entitled to accrue pre-judgment interest. Much time has elapsed since the claims arose, and such interest would amount to much more than the principal amount by the time appellate review is complete with respect to the final judgments to be entered herein.

 Interest, as damages for the delay in payment of money or other legal obligations, as distinct from contractual interest, is a matter of substantive right, and the law of the place where the cause of action arose, or the law of the place of performance of the contract or duty to pay rather than the law of the forum, determines whether there is a right to such interest and the rate thereof. See *Fanning v. Consequa*, 17 Johns. 511 (1820) and cases therein cited.

 Under *Erie* principles, whether the plaintiff in this dispute is entitled to pre-judgment interest will be a question of New York law. The debt sued upon is here, the defendants are here, and New York was the place where Chase and Citibank should have credited Banco Nacional with the sums due in these actions.

 Section 5001, New York CPLR, which as to claims at law reenacted prior statutory provisions without substantive change, provides that pre-judgment interest shall be recovered "upon a sum awarded because of a breach of performance of a contract, or because of an act or omission depriving or otherwise interfering with title to, or possession or enjoyment of, property." Historically, in New York the right to pre-judgment interest has not been as absolute as a literal reading of the statute would suggest. Generally pre-judgment interest has been awarded either in the nature of a penalty, or as damages for the withholding of the payment of money, or for the purpose of awarding just compensation, and therefore as a part of the computation of the total damages which would be required to be paid in order to effect a just indemnity. See generally, *Van Rensselaer v. Jewett*, 2 N.Y. 135, 140 (1849) and *Prager v. N. J. Fidelity & Plate Glass Insurance Co.*, 245 N.Y. 1, 6, 156 N.E. 76 (1927, Cardozo, Ch. J.).

 Ordinarily the New York courts award pre-judgment interest on money from the time when the money becomes due and *payable*. Expressed differently, interest is said to be an invariable legal incident of the principal debt only whenever a debtor knows precisely what he is to pay and when he is to pay, but does not. *Gray v. Prudential Insurance Co.*, 46 N.Y.S.2d 850 (Sup.Ct.N.Y.Co.1943), *rev'd. on other grounds*, 267 A.D. 688, 48 N.Y.S.2d 82 (1st Dept. 1944). There is an exception of long standing to the award of pre-judgment interest by way of damages for the detention of a debt. Whenever the law prohibits payment of the principal, interest during the existence of the prohibition is not de-

mandable. See *Wheelock v. Tanner*, 39 N.Y. 481, 504 (1868); *Moscow Fire Insurance Co. v. Heckscher & Gottlieb*, 260 A.D. 646, 648, 23 N.Y.S.2d 424 (1st Dept. 1940), *aff'd*. 285 N.Y. 674, 34 N.E.2d 377 (1941). An analogous New York statute, § 100–b(4) of the Banking Law, provides that a trust company is not required to allow interest upon uninvested funds held by it as a fiduciary where payment of the principal is prohibited under any order, regulation or ruling issued under or pursuant to the Trading With the Enemy Act.

██ The logical basis for these rules is applicable here. Remittances to Cuba have been, during the relevant time period, prevented by federal law, 31 C.F.R. § 515, and payment by Chase of the ultimate balances found due was impossible at all relevant times. There is no basis for distinguishing between blocking of funds, and judicial obstruction, such as an injunction, both of which prevent payment by a debtor.

██ Traditionally, in cases of insolvency or bankruptcy, no interest is allowed, unless there are surplus funds available for that purpose. Courts considering the withholding of interest in such a situation have traditionally observed that "delay in the payment of a claim undoubtedly results in injury to the creditor. He does not receive full compensation unless interest is paid to him during the time in which payment of his claim is postponed. But the delay in distribution is the act of the law; it is a necessary incident to the settlement of the estate." *In re Application of Stoddard*, 249 N.Y. 139, 163 N.E. 129 (1928). Here, in the instant case, the debts to and from Cuba although due, were at no time *payable*, and for that reason they should not bear any pre-judgment interest. Indeed, they are not payable now, and may not be payable after the judgment of this Court has been processed through final appellate review.

## XIII

*Effect of the Determination of Damages by the Foreign Claims Settlement Commission*

██ Citibank argued before Judge Bryan that this Court may, and indeed must, adopt the damage figure certified by the Foreign Claims Settlement Commission to represent Citibank's loss in Cuba. While this Court believes that the determination of the Foreign Claims Settlement Commission has some evidentiary value, and is admissible and available for consideration by the Court under Rule 803(8)(A) and (C), F.R.Evid., the result is binding neither on this Court nor on plaintiff.

Citibank relies on a general provision in the Act establishing the Foreign Claims Settlement Commission to support this argument. The relevant language, in 22 U.S.C. § 1623(h), is as follows:

"The action of the Commission in allowing or denying any claim under this subchapter shall be final and conclusive on all questions of law and fact and not subject to review by the Secretary of State or any other official, department, agency, or establishment of the United States or by any court by mandamus or otherwise."

In addition, Citibank relies on 22 U.S.C. § 1623(b), which reads in relevant part as follows:

"Each decision by the Commission pursuant to this subchapter shall ... constitute a full and final disposition of the case in which the decision is rendered."

██ When read together as a part of the total statutory scheme, as they must be, these provisions are considered merely to prevent judicial tinkering with the total amount of loss certified by the Commission with respect to any claimant. That is to say the Commission's determination of the amount of a claimant's loss, made after hearing claimant but without giving the foreign nation an opportunity to be heard or present evidence, is final for purposes of distributing any money ultimately received from a foreign government in lump-sum negotiated diplomatic settlements of the total claims of American nationals for property taken, and/or as a result of our Government having blocked the foreign funds located here. The reason for such a provision is obvious. The lump-sum payment of in-

demnification will be distributed *pro rata* among claimants in accordance with the amounts of their claims. Challenge by one claimant to the total dollar amount fixed for his claim would delay distribution of the settlement funds to all claimants, since ordinarily no distribution can be made until the total amount of outstanding claims has been adjudicated by the Foreign Claims Settlement Commission, so the percentage of recovery by all claimants can be determined. See, 95 Cong.Rec. 8854 (1949), which sets forth the Senate debate on 22 U.S.C. § 1623(h) as follows:

"Mr. VORYS. The gentleman in his bill sets up a thing which approximates in some ways judicial procedure. Can the gentleman give this committee one single solitary reason why he wants to deny claimants the right to go to court which this amendment would give him?

Can the gentleman cite one reason?

Mr. RIBICOFF. Yes. The reason, as the gentleman may know, as we discussed it very thoroughly in committee, is that we are setting up here an expeditious handling of claims. We know that if you take these claims and get them involved in continuous court controversy, it will be many, many years before these claims are settled. You have a constitutional prohibition against courts interfering with settlements, and also you would have all these claims interminably tied up in court where one claimant with one appeal could tie up the settlement of 1,500 claims. We believe that three United States Commissioners would administer justice. In the final analysis, the main issue here is the amount involved, and the gentleman from Ohio well knows that any finding of fact based upon contradictory evidence would be conclusive upon a court anyway, and all that could be gained would be someone striking against the Commission and holding up $17,000,000 worth of claims.

\* \* \* \* \* \*

Mr. JENSEN. Do I understand that this Commission has full authority to decide all these claims? In other words, are they a court of last resort?

Mr. RIBICOFF. They are, sir.

Mr. JENSEN. So whatever they decide, the claimants have no recourse to any other court of the land?

Mr. RIBICOFF. That is correct, sir.

\* \* \* \* \* \*

Mr. VORYS. Mr. Chairman, I move to strike out the last word.

Mr. Chairman, if the Committee will look at the majority report, you will see they make a lot of the fact that they are attempting to approximate judicial procedure in dividing up this $17,000,000 that belongs to the United States, among United States claimants. So there is not any question coming up except whether United States nationals have a right to this fund that belongs to the United States. This is the type of question which many of the claimants may not want to submit to the final decision of these three bureaucrats appointed by the Secretary of State.

For 10 long years, since I have been a Member of this House, we have heard a great deal of defense of the administrative agencies and commissions, that they should be given the right to make final decisions, so as to secure rapidity and flexibility. But we wiped that all out with the Logan-Walter law. We said, under the Act of Administrative Procedure, that these various boards and bureaus are going to be subject to review by the courts of the land. A man is not going to have to take the last word of some administrative bureaucrat. He is not going to have to know the right people in the Department. He is not going to be of the right political party or hire the right lawyer. He is going to have a chance to go into court if he disagrees, and an independent judiciary is going to decide what his rights are. But now, in this strange, anomalous thing that is brought here we are going to go back on the Logan-Walter law and say, 'Oh, no, no. All other boards, bureaus, and agencies around here must have some kind of court review, but not the State Depart-

ment.' The fact that such review is possible has had a very beneficial effect on those agencies that exercise quasi-judicial functions. But when it comes to American nationals making a claim against their own Government for money which their Government has collected on their behalf from another country, you say, 'Oh, no. Your appeal is to the 'guys' who made the decision.' These three bureaucrats. 'If you do not like it, you can lump it.'

Now, this amendment is simply to strike out that language in this bill and therefore leave it under the appellate procedure which the Congress, after years of debate and discussion and after consultation with all of these agencies, set up under the Administrative Procedure Act, providing for efficient and just court review for an American citizen. I hope the amendment is adopted."

After this discussion, the views of Senator Ribicoff prevailed.

Reported cases citing the statute go no further than to hold that challenges by claimants who question the amount of the loss certified by the Commission cannot be adjudicated in the district court. *Zutich v. Gillilland*, 254 F.2d 464 (6th Cir. 1958); *American and European Agencies, Inc. v. Gillilland*, 247 F.2d 95 (D.C.Cir.), *cert. denied*, 355 U.S. 884, 78 S.Ct. 152, 2 L.Ed.2d 114 (1957); *Haas v. Humphrey*, 246 F.2d 682 (D.C.Cir.), *cert. denied*, 355 U.S. 854, 78 S.Ct. 83, 2 L.Ed.2d 63 (1957); *DeVegvar v. Gillilland*, 228 F.2d 640 (D.C.Cir.1955), *cert. denied*, 350 U.S. 994, 76 S.Ct. 543, 100 L.Ed. 859 (1956). They do not stand for the proposition that the Foreign Claims Settlement Commission can adjudicate with finality a *res inter alios*, as Citibank apparently contends.

The Foreign Claims Settlement Commission itself contemplates that claimants may recover all or part of their losses in unrelated judicial proceedings, and such proceedings are not barred by the finality provisions of the Act. For example, in its determination of claims by Chase Manhattan Bank, Nos. 2684 and 2685, the proposed decision of August 4, 1971, No. CU–6294 (altered on a different ground in final decision No. CU–6295 of October 20, 1971), provided that any recovery by Chase in these lawsuits would be deducted from the amount of Chase's loss as certified by the Commission. The difference of course is that in these lawsuits Chase and Citibank have the chance of recovering in full, whereas claimants before the Foreign Claims Settlement Commission will likely recover only an uncertain percentage.

To hold that the Foreign Claims Settlement Commission's *ex parte* determination of the amount of Citibank's loss in Cuba is binding here against Bancec, or the Cuban Government, would violate a basic principle of our jurisprudence and would represent a denial of due process. Accordingly, it would be inappropriate to apply such a finding as having binding effect in this litigation, and this is so wholly apart from the separate issue of whether an administrative determination ever has *res judicata* effect. See K. Davis, *Administrative Law Treatise*, § 18.01, *et seq.* (1958).

The Court will consider the decision of the Commission, but only as some evidence of the truth of the facts found therein, including the amount of value.

## XIV

*Computation of Damages of Chase*

Chase's four Cuban branches were treated for bookkeeping purposes and convenience as a single so-called "Havana Branch" and will be referred to herein on occasion as a single branch. Chase has presented two separate theories, separately pleaded as separate counterclaims with respect to the confiscation of its Havana Branch. The first is referred to as the "separate entity" or "contract theory" of damages, and is based on the contention that the Havana Branch should be treated as a separate entity in the nature of a subsidiary corporation, whose relationship with the parent, defendant here, is that of debtor-creditor. Chase claims that the Havana Branch was indebted to its home of-

fice at the time of taking in the amount of $5,780,228, and that by virtue of Cuban law, specifically Resolution 2 of September 17, 1960, when plaintiff confiscated the branch, it assumed all the debts of the Havana Branch, foreign and domestic, including its indebtedness to the home office.

The second counterclaim, sometimes referred to as the "single entity" or "conversion theory", is based on the contention that the Havana Branch and its assets were the property of Chase, and that Banco Nacional and the Government of Cuba converted that property, and defendant therefore is entitled to recover compensation for the conversion in the amount of the value of the assets, including going concern or "good will value" taken. This claim is asserted in the amount of $8,213,204.

For our purposes it matters little whether the claim is posited on the tort theory of conversion; or on the theory of an implied contract with Banco Nacional which received the expropriated property under circumstances which would lead to an agreement implied in law or in fact, or both to pay the fair value thereof, or if the claim be regarded as analogous to an action for reverse condemnation, or a claim under general principles of international law requiring full, fair and prompt payment for expropriated properties of aliens. In all events, one whose property is taken under the circumstances here present is by international law entitled to the full, fair and prompt recompense for all that is taken. Whichever theory of liability is applied leads to that same conclusion. The Court rejects plaintiff's demand that Chase make an election between or among any theories implicit in the case, or asserted by it at trial. Treating its claim as in the nature of an action for conversion, regarding the branches as a single going business, Chase claims damages of $8,213,204, broken down as follows:

| | | | |
|---|---|---|---|
| A. | Stated Capital | $4,000,000 | |
| | Less recovery applied against capital | 391,000 | $3,609,000 |
| B. | Unremitted profits | | 923,320 |
| C. | Unearned discount | | 29,025 |
| D. | Reserve for Taxes | | 170,448 |
| E. | Contributions to retirement and thrift incentive plans | | 129,372 |
| F. | Charged off loans | | 157,343 |
| G. | Banking Houses and real estate appreciation over book value | | 189,767 |
| H. | Going business value or good will | | 2,850,000 |
| I. | Reimbursement to personnel for personal property abandoned on closing of branches | | 154,929 |
| | TOTAL | | $8,213,204 |

Plaintiff would compute the damages under this theory, assuming that they are recoverable, as $3,338,326. We note briefly the damage claimed under Chase's first counterclaim as an amount due from a separate economic entity, which was indebted to Chase's home office for various money invested in the branch by the home office, and the net sums owed the home office in other transactions. Under this theory, Chase argues that Banco Nacional assumed the liabilities of the branches, which it did with respect to the domestic liabilities, pursuant to Law No. 851, and that this indebtedness totalled $5,780,228. Damages under the first counterclaim are itemized as follows:

| | | | |
|---|---|---|---|
| A. | Capital Loan | $4,000,000 | |
| | Less recovery applied against capital | 391,000 | $3,609,000 |
| B. | Unremitted profits | | 923,320 |
| C. | Unearned discount | | 29,025 |
| D. | Reserve for Taxes | | 170,448 |
| E. | Contributions to retirement and thrift incentive plans | | 129,372 |
| F. | Charged off loans | | 157,343 |
| G. | Overdraft in account with home office | | 94,515 |
| H. | Payment of Letters of Credit by home office | | 667,205 |
| | TOTAL | | $5,780,228 |

As noted previously, plaintiff argues that Cuba did not assume the branches' external liabilities, and that a branch cannot be indebted legally to its home office, and even if such a debt is legally cognizable, the figures are computed incorrectly, and under plaintiff's theory, amount to only $370,720.

The financial effect of the first counterclaim differs from the second counterclaim only in that the overdraft, and payments on letters of credit are included, and the going business value and real estate appreciation items are left out. Chase filed separately before the Foreign Claims Settlement Commission for the confiscation of its Cuban branches under claims Nos. CU–2684 and CU–2685, decided together under a single final decision No. CU–6295 dated October 20, 1971. There the Foreign Claims Settlement Commission, when presented with these same two alternate theories of valuation, found that:

"Claimant [Chase] was the owner of the branches in Cuba and . . . the claim should be predicated upon the ownership of the property taken, and not upon claimant's character as a creditor of its branches."

■ Accordingly, Claim No. CU–2684, based on the creditor or separate entity theory, was denied without further discussion. This Court agrees. The amount of "indebtedness" between the Cuban operation and the home office, with the exception of unremitted profits, which were a set aside fund, not necessary for use of the business and merely awaiting issuance of a currency control permit, is purely a matter of historical fortuity. The value of these accounting balances has no direct or logical relationship to the value of the property, or going business concern, taken, as of the time of the taking. What is significant, and all that was taken, is the value of the business and its assets, and the investment which had been produced as a result of incurring the indebtedness to the home office. Some of these assets had appreciated in value at the time of the taking, while others had diminished in value.

It is clear from the foregoing that Chase's damages should be based on the value of the taken business and its assets at the time and place of taking, a matter totally unrelated to the historical net indebtedness of the branches to their home office. Accordingly, the Court will consider only the theory of the second counterclaim or single entity theory and will value the branches as a single going business located in Cuba, owned by Chase.

Plaintiff admits that the items for capital, unremitted profits and contributions to retirement and thrift incentive plans are fully justifiable figures. It disputes the validity of all of the other items of damages, and seeks a credit from defendant for additional charges or deductions against capital and/or recoveries.

In our consideration of the separate items, we are reminded that Chase and Citibank are both member banks of the Federal Reserve System and that Citibank is and was then a national bank. Chase

was also a national bank from 1925 to 1955, and from 1965 to present. In the interim it was chartered by the State of New York.

█ It is a federal crime for anyone to make a false entry in any book, report or statement of a national bank or a member bank of the Federal Reserve System with intent to injure or defraud, or with intent to deceive any officer of the bank or the Comptroller of the Currency or a bank examiner. See 18 U.S.C. § 1005. There is a complex, long established, system of federal regulation in the United States whereby bank examiners, under the direction of the Comptroller of the Currency of the United States make surprise audits of banks such as Chase and Citibank, both with respect to their foreign and domestic operations, audit their reports and examine their accounting practices. Drastic remedies are available to the Comptroller in the event of any falsification, or even negligent or inaccurate recordkeeping. These include the power to require that honest entries be made, and specifically the power to require that reserves be established whenever it shall appear that assets are worth less than the value stated per books. Besides the statutory requirement for making reports to the Comptroller under oath and the detailed provisions for audit, with civil and criminal penalties for non-compliance, the Comptroller has the further right and duty to publish his relevant findings. The totality of this statutory scheme has the tendency to assure that the books and records of institutions such as Chase and Citibank reflect current conditions accurately at all times. For state chartered banks, New York has a similar regulatory and bank examining bureaucracy which is generally regarded as at least equally strict and demanding.

█ Furthermore, Chase and Citibank operations in Cuba, in addition to reporting directly to the Comptroller of the Currency, as a part of the Bank's overall operations under comprehensive federal regulation in this country, were also subject to the bank examining powers of Banco Nacional, which had the power to require that the books of the Cuban operations be regularly kept in the regular course of business, and maintained in accordance with generally accepted accounting principles consistently applied, so as to give a true result of Cuban operations, for protection of local governmental interests. The books of a national bank or a member bank of the Federal Reserve System present far less opportunity for "creative accounting" than that found in the ordinary domestic business. In view, particularly, of the double regulation present here, the entries may be treated as having evidentiary validity. This is appropriate especially where, as here, the passage of time and the present unavailability of local information in Cuba presented difficulties at the trial. The Court believes that having been regulated by the banking authorities both in the United States and in Cuba, the books and records of the bank may be regarded as correct and reliable, except to the extent actually impeached on the trial. See, F.R.Evid.Rules 803(6) and 803(8). We then turn to a separate discussion of each item:

A. *Capital.* The books and records support an allocation to the branch of $4,000,000 as capital, inclusive of reserves in the amount of $2,021,547.55. CDX 12, 16 and 17. It is undisputed that Chase recovered in 1969 on certain bonds of the International Bank for Reconstruction and Development. Although these bonds were physically located in Havana in 1960, and were seized by plaintiff or the Cuban Government, the bonds were registered in the name of Chase, and Chase was able to and did recover that credit. Thus the net capital account stands at $3,609,000. Banco Nacional seeks to reduce this figure by the further sum of $761,154, which represents the total of four loans made by the Cuban branches to Cuban companies, which were guaranteed as to payment by parent or related corporations in the United States (the "U.S. Guarantors"). These loans were:

| Obligor | Guaranty or Collateral |
|---|---|
| H. H. Pike Trading Co. | Guaranty of H. H. Pike & Co. |
| Remington Rand de Cuba, S.A. | Guaranty of Remington Rand Division of Sperry Rand Corp. |
| General Motors Acceptance Corp. of South America | Guaranty of General Motors Acceptance Corp. |
| Pfizer Corp. | Guaranty of Chas. Pfizer & Co., Inc. |

The parent or guarantor corporations were all solvent in 1960, and present in the United States where they were amenable to civil process, and have remained so throughout the period. Plaintiff argues that these four loans were clearly recoverable by Chase from the U. S. guarantors, and although Chase never collected from them, the loans should not be charged to plaintiff, but Chase should be treated as having received a constructive recovery, which would diminish the amount of its capital account.

■ This argument is rejected. The statutory scheme by which Banco Nacional or the Republic of Cuba seized all of Chase's banking operations in Cuba included assumption by Banco Nacional of all deposits and all local banking assets including the claims against these four obligors which were present in Cuba or domiciled there. Banco Nacional, by the seizure, was enabled and entitled to collect against the obligor businesses in Cuba which owed money to the branch or from any interventors or successors in interest owning those businesses. This Court assumes it did so in absence of evidence to the contrary. Chase had no records as to balances owing after September 17, 1960. It did not possess the notes or accounts of the principal obligors after that date. It would be inequitable for plaintiff to prevail here on this contention when it was the seizure of Chase's property in Cuba which prevented the Bank from access to the necessary instruments and records to assert the claim against the guarantors had it decided to do so, and when Banco Nacional was in a position as Chase's successor under Cuban law to pursue the Cuban obligors. In addition, no duty is found in law or in equity which requires Chase to look to the guarantors rather than to the convertor of the underlying guaranteed obligations of the Cuban borrowers. I hold and conclude that Chase is not to be charged with constructive recovery of the four guaranteed loans. All contentions to the contrary are rejected.

Plaintiff would also charge Chase with a separate reduction in item A for unrecorded depreciation in the market value of investment of securities held by the branch. It argues that the market value of the branches' investment portfolio had decreased substantially from book value by the date of nationalization, and this depreciation must be taken into account in the valuation process. It is noteworthy that the regulatory authority in Cuba prior to confiscation did not require any write-down in the investment portfolio, a practice ordinarily insisted upon by those who regulate banks. Determination now of the actual market value of these securities on the date of nationalization is extremely difficult. Like most banks, Chase normally valued its securities at cost, unless there was a regulatory objection to a particular asset, or an indication of a *permanent* impairment in value, in which case the value would be reduced to a lower figure. As of June 30, 1960, the branch had taken a customary write-down of some of the securities.

Stephen P. Radics, a Certified Public Accountant, testified for plaintiff as an expert based upon his prior service rendered to regulatory authorities in the field of banking and insurance with respect to the valuation of securities. Radics testified to valuations he had made of securities carried on the books of Chase's Havana branch. Radics seized upon what he perceived as an inconsistency in Chase's own valuation of some of its securities. As of June 30, 1960

the branch had taken a customary write-down in market value of some of its securities, carrying some of them at 80% of value, and others at 93%. Radics concluded that on the basis of the branch's own valuation of some of its securities, others of like maturity and coupon should likewise be written down in the name of consistency. He testified, for example, that the Social and Economic Development Bonds of the Republic of Cuba, 4%, due 1956–58, payable in dollars, should have been written down by 20% since a similar issue payable in pesos had been so written down by Chase, and under local currency regulations, a resident of Cuba holding such bonds would be required to receive payment exclusively in pesos. He also criticized carrying Cuban electric bonds at cost, because "I assumed that this would be at the approximate same 93% in value as the Tribunal Bonds because they had like maturity and the interest rate was very close." (Tr. p. 283). He reached the same conclusion as to the Marianao Aqueduct Bonds.

In the witness's own language, his testimony was "an assumption." (Tr. p. 284). His testimony continued to make similar assumptions, namely that because some bonds had been written down prior to the confiscation of the branch, other like bonds should have been written down. These assumptions by Radics, made long after the fact, do not, in this Court's opinion, justify or substantiate the adjustments claimed. His testimony is not entitled to sufficient weight to rebut the inference of regularity, which applies to the books and records of the branch, kept as noted before, in the regular course of business by Chase, under the close supervision of regulatory authorities, both American and Cuban. Based on his assumptions, Radics claimed a write-down of $617,070. This Court regards the necessity for any such write-down as not proven, and speculative at best. To the extent that Cuban bonds were taken over and held by Banco Nacional as a part of the confiscation, there is no reason to believe that the bonds were not paid at face to Banco Nacional in due course of their respective maturities.

Many of these securities were issued by Cuban government entities, and banks were required to purchase them in order to remain eligible for Government deposits. Radics relied on June 30th market values, and submitted no valuations as of the date of the taking. While market values on the date of the taking may well have been lower, in view of deteriorated conditions in Cuba, as noted before, the branch properly valued its securities at cost, absent a permanent impairment in value. No such permanent impairment was shown beyond the branch's voluntary reduction of certain securities in presumed compliance with regulatory standards, not applied to others, in June of 1960, prior to expropriation. The speculative testimony of Radics that the values recorded on Chase's books were above the permanent value of the investments is insufficient, and the Court will accept Chase's valuation of its investments to the extent of finding that there is no impairment of the branch's capital by reason of any security over valuation.

A further problem is presented with respect to the capital account item. Chase has proved that on the date of the taking there was an "overdraft" in its account with the home office, amounting to $94,515. Such overdrafts were a regular consequence of the bookkeeping procedures between the Cuban offices, consolidated for recordkeeping purposes at the Havana branch, and thereafter posted, as operating results of a separate economic enterprise, to the records of the home office in New York. Between 1925 and 1937 the entire working capital of the Chase Cuban operation was supplied in the form of an overdraft. From time to time since 1937 such overdrafts were cancelled out by assignment and delivery of additional allocated capital to Havana, usually in the form of bonds or other securities, but sometimes by remitting dollars. Not only from an accounting point of view but in economic reality, the creation of this overdraft and prior negative balances had the same effect as the further contribution of capital to the Havana branch. In

effect, the head Cuban branch in Havana was permitted to overdraw its checking account in dollars with the main office, so that the reflection on the books of the main office in New York would be a negative balance in the Havana branch checking account. This appears from the deposition of Michael P. Esposito, Jr., taken April 10, 1974, Ex.G. There is no reason why the overdraft amount should not be treated as a part of the capital account, for our purposes indistinguishable therefrom in fact or law.

There is also involved with the capital account the additional sum of $667,205 for payments made after September 17, 1960 by the home office to beneficiaries of some 203 separate international letters of credit lawfully issued by the branch for Cuban enterprises (customers of the branch) payable in dollars in New York. Chase received no reimbursement from the branch or from Banco Nacional. See DX 1 and Agemian Affidavit, docketed May 26, 1961.

The practical effect of these letters of credit transactions may be summarized in one of two ways: (1) these payments may be regarded as additional contributions to capital of the Cuban branches, or additional investment therein; or (2) they may be regarded as countervailing entries to loans made to, or money received or to be received from customers in Cuba by the Cuban branches either before or after September 17, 1960. If the latter analysis is pursued, the Court will infer that Banco Nacional, as the successor in interest of the domestic banking businesses of Chase's branch, received the monies paid or to be paid by the customer in pesos for these letters of credit. Expressed differently, as a result of the seizure, Banco Nacional became the successor in interest of Chase with respect to the loans extended or promised to the Cuban customers or purchasers of these letters of credit. As a result Banco Nacional became entitled to collect the avails of the customers' side of the letter of credit transaction in pesos in Cuba, while Chase, in New York was required to and did pay the beneficiary's side of the transaction in New York in dollars, in the total amount set forth above. Thereby, Banco Nacional

became obligated in quasi-contract to pay Chase for having accepted the burdens of these transactions, inasmuch as it had derived the benefit.

While the latter analysis would seem to be justified against the background of ordinary international banking practice, the situation in fact is that had there been no seizure of the branches, when the beneficiaries of the letters of credit were paid in New York in dollars, the amount so paid would have been booked as an addition to the overdraft for the Cuban branch, and carried in that fashion until a currency exchange permit was issued to allow remittance to the home office, or countervailing international transactions resulting in charges to New York and credits to Havana wiped out the overdraft. Overdrafts, as noted, represent part of the capital of the branch. A firm commitment to create an overdraft is no different from one already booked. The Court prefers the first analysis, and believes that these payments should be treated as a part of the capital investment of Chase in the Cuban branches, because Chase had obligated itself in that amount to be added to the overdraft the moment that the letters were issued. By permitting them to be issued, Chase was in effect, by that act alone, contributing capital or placing funds at the disposition of its Cuban operations indefinitely. But, whether treated as part of the capital investment of Chase in the Cuban branches, or alternatively, as a quasi-contractual obligation of Banco Nacional, the sums due on these letters of credit are a proper item for set-off in the case. We note that in the hypothetical valuation of the Cuban branches upon an arm's length sale to a purchaser intending, as Banco Nacional did here, to carry on the business of the branches, these sums would represent current items to be adjusted in favor of the seller at a closing of the sale, since the purchaser (Banco Nacional) became vested with the right to collect from the customers, while Chase remained liable to pay the beneficiaries.

The Court will add the sum of $94,515 for the overdraft, and the further sum of $667,-

205 for the letters of credit paid to beneficiaries after the taking to the net recovery under Item A for capital, which is accordingly fixed at $4,370,720.

B. *Unremitted Profits.* Plaintiff does not dispute defendant's computation for $923,320 in unremitted profits of the Cuban branch. This money would have been remitted to the home office but for want of a currency control permit. Chase had applied for the permit, which at the time of the taking, had neither been granted nor denied.

C. *Unearned Discount.* This item represents prepaid interest by borrowers which was not earned by the Bank as of the date of the taking, but which would be accrued and earned over the balance of the loans outstanding. Unearned discount, until earned, cannot be considered an asset of the branches. Should any of the loans be prepaid, it would be necessary to refund all or part of the unearned discount. The branch carried this as a reserve item on its own books of account, and when Banco Nacional took over the day-to-day operations of the Chase branches, I infer that it must have granted credit or benefit to any domestic borrowers who prepaid, and that its earnings in the subsequent accounting period were reduced in like amount. Recovery on this item accordingly must be denied, since it is a reserve item for which Banco Nacional, or any purchaser of an ongoing banking concern would be deemed to have paid simply as a part of assuming the business and acquiring the right to the flow of future earnings after the transfer of ownership. This is the sort of accounting item which leads to a closing adjustment in favor of the buyer when a banking enterprise changes hands as a result of an arm's length sale.

D. *Reserve for Taxes.* This item represents an accrual of the taxes owed by the branches to Cuba on local earnings for the first eight months of 1960, which would be payable at the end of the year. It is taxes incurred for previous operations, but unpaid, rather than a reserve for taxes not yet accrued. Nor is it a prepayment of future taxes. Chase argues that once the branch was expropriated the money was freed from its status as a reserve, since "the Cuban Government would not pay taxes to itself." This argument misses the point. The reserve account represented taxes on profits which had already been made. These taxes were owed to the Government for operations through August of 1960, even if they need not be paid until the end of the year. Although the branch may have been in possession of the assets represented by this account on hand in September 1960, this amount was already committed to the tax payment which Chase would have to make at the end of the year. The particular taxes due in the corresponding amount are to be regarded as paid and this sum shall be eliminated from the computation of the assets to be paid for. The same result would follow in negotiation of the theoretical arm's length sale of the branch to another bank, that is, here again, this item would represent an accounting adjustment in favor of the buyer at a closing.

E. *Contribution to Retirement and Thrift Incentive Plans.* This account was for money paid to trustees of the plans by the home office on behalf of the branch. Its validity is clear and is conceded.

F. *Charged Off Loans.* This item represents losses arising from uncollectible loans, so regarded, made by the branch prior to confiscation. Sometimes such charged off loans are collected later, but in effect such an account is a reserve for bad debts, based on the best estimate of the managers of the branches as of the date that the reserve was booked. Like the rest of the accounting entries of this regulated industry, the book entries carry a presumption of regularity, having been made prior to litigation. There is no evidence that these reserves were calculated in any fashion other than properly, or that the charged off loans had any value. For those reasons this item of damage is disallowed. While Banco Nacional succeeded to the ownership of the charged off loans, there is no evidence that it collected any of them, nor if so, what amount of charged off loans was collected. The item is worthless.

G. *Banking House and Real Estate Appreciation.* On its books (DX 12) Chase listed its real estate holdings at a depreciated cost of $110,232. The latest available appraisal of any of the branches was made on March 28, 1960 and applies only to the Havana office (DX 13). This values the premises owned by Chase at $165,090, and the necessary adjustment to bring the book value for that property to market would be $54,858. The Court regards the appraisal, which was made prior to the commencement of any litigation, as valid, and is convinced that the premises did have a value in excess of book value. There is no evidentiary basis to write up any of the other items comprising the banking house and real estate account beyond that shown on the corporate books.

I. *Reimbursement of Personnel.* It would have been a crime, in Cuba, for any branch employees not to have cooperated fully with their new employer, Banco Nacional, or to have impeded the takeover of the Chase branches in any fashion. In view of the sensitive circumstances surrounding the nationalization, Chase in effect advised, or it is now said, "directed" a number of the branches' employees both North American and Cuban, to leave Cuba. In their hurried departure, these persons left behind personal property, which they could not bring into the United States, either because of the shortness of time or the inability to obtain permission to export it. Under Law No. 989, all property of persons fleeing from Cuba was confiscated.

Chase paid the sum of $154,929 to its employees, and this represents the reasonable value of the property left behind and confiscated by Cuba. The employees made formal representations to their employer of the items taken and the reasonable value, and did so under conditions having intrinsic indicia of reliability, and conducive to truthful statement. The Court regards these claims as received in the regular course of business of the Bank, and acted upon and paid by the Bank to the employees prior to this litigation. After this litigation was commenced, or in con-

templation of claims against the Cuban Government, Chase caused its employees to "assign" all these claims to Chase, and now asserts that it is entitled to include this amount in its recovery. There is a good basis for denying this aspect of the claim. The entitlement to set-off found in *Banco I, supra,* should not be regarded to embrace counterclaims or set-offs originally belonging to a third party and acquired by a defendant in anticipation of litigation, or after it has been sued by a foreign state, and in order to set-off. To hold otherwise would call up a brisk trade in claims against foreign states, and would in effect nullify the Act of State doctrine, and prevent access by the Government of Cuba to the United States courts against any United States defendant having the willingness and creativity to buy up Cuban claims of others to assert as assignee. This case is not one where Chase went out shopping for claims to assert against plaintiff, but we cannot allow a result here which would permit that to be done in the next case. Here, the assignors of the claims had a special relationship to Chase, and indeed Chase had a moral obligation, and perhaps a legal one [*Cohn v. Lionel Corp.*, 21 N.Y.2d 559, 563, 289 N.Y.S.2d 404, 236 N.E.2d 634 (1968)], to reimburse them for their losses, and did so. However, the Court concludes that this is not a proper item for recovery by way of set-off. The set-off extends to Chase's property expropriated by Cuba, and not the property of others expropriated, even when such assignments were given to Chase for a proper purpose and for full value paid. This item is disallowed.

H. *Going Business Value, or Good Will.* In its presentation Chase has used the expression "going business value." Reference has also been made to the "good will" value of the Chase branches. These words do not necessarily have the same meaning to this Court. The going business value is that price which a knowledgeable purchaser, trading with a seller at arm's length, neither party under any compulsion and each fully informed, will pay for the right to continue a going business, and to

receive the income stream or cash flow which that business will generate for the foreseeable future. Included in that payment, however, is the transfer to the purchaser of those physical assets and capital which are essential in order to continue to operate the business in the manner in which it has been operated. Here, Chase's financial statement contained items such as unremitted profits, which would have been repatriated had currency control conditions permitted and were not necessary to continued operations. However, most of the balance of Chase's capital account and physical assets were necessary to be owned by any person or corporation operating the Cuban branches.

■ Good will, on the other hand, is the pure dollar value of the right to receive the stream of income after the necessary capital has been invested to enable the purchaser to continue in the business. It is the "premium" which the purchaser of a profitable business pays, over and above the value of the tangible components necessary to operation of the business.

Radics testified (Tr. p. 296) that "going business value is something separate and apart from any other measure of value for any business enterprise, including a bank," and that in the case of the valuation of a bank, "a premium for extraordinary earning power would normally only come into play if the going business value as separately determined, resulted in a greater figure than the net assets of the bank itself." His nomenclature is appropriate. Radics gave the opinion that such separate determination would not result in a greater figure in the case of Chase, but testified that in all events it would be improper to calculate going business value and add it to the fair market value of the assets. Rather, in valuation he would use the greater of the two figures; that being the value of the bank. Any amount by which the going business value of the bank exceeds the asset value is referred to as a premium.

Radics also contended that the home office had advanced working capital to the branch. The Court assumes that the home office, acting in the regular course of business, placed its capital where it would be most productive, as indeed any business enterprise would do. The record shows that upon providing capital of $4,000,000 and adequate banking premises from which business could be conducted, Chase would have been and was able to produce the stream of earnings. Radics contention that if application to the earnings stream of a price-earnings multiple results in a lower figure than the asset value, there is no premium or good will value, although valid facially, must be based on an analysis considering the minimum necessary capital investment. Here, Chase had excess assets at risk in Cuba. With its stated capital of $4,000,000 and its real estate appreciation, Item G, amounting to $54,858, Chase could operate the Cuban branches. This sum, $4,054,858 is the necessary net capital investment. Any amount by which the going concern value of the enterprise exceeded that sum represents good will, or the premium which the hypothetical arms length purchaser will pay to acquire the stream of earnings.

We consider now the proof as to the value of the stream of earnings.

Charles Agemian, a former Executive Vice President and Comptroller General of Chase had served 43 years with the Bank, and participated in all its acquisitions. He testified as to the going concern value. Agemian arrived at the $2,850,000 figure, Item H, *supra*, by averaging two estimates for going business value, each reached by different methods. The first method was based on a percentage of deposits, the other on a multiple of earnings. The Court believes that there is no logical basis to add the result of these two methods, and divide by two. Rather, we must test the logic and reason of each method, and determine whether either one leads to an apparently rational result.

Chase also introduced a report prepared in 1974 by Thomas H. Barton and Co., Inc. a management consulting firm (the "Barton Report" DX 15). This Report calculated a going business value premium of $2.5 to $3

million dollars for the branches, based on expected deposit and earnings growth. The Report estimated that the branch might have been sold in the fall of 1960 for $7.5 million. Those projections were based on the assumption that "normal business patterns" in Cuba had not been interrupted as of January 1, 1959. The Barton Report did not attempt to assess the impact of the Cuban Revolution on the branches' value, but valued the branch as if the Revolution and succeeding events had never occurred. Actual figures for 1959 and part of 1960 show that the Barton Report's "projections" were far removed from the reality of actual deposits of the branches.

The Barton Report made comparisons with banks in other areas to determine a range of price-earnings multiples, profit growth rates, deposit growth rates and other figures in order to calculate the value of Chase's Cuban branches. Banks in Honduras, the Virgin Islands and other areas were studied. In addition, the Barton Report compared the Cuban branches with banks in Puerto Rico and Panama having many conditions in common with Cuba. The author believed the experience in those countries would give an accurate picture of the probable range of growth of the Cuban branches "Had [they] been allowed to develop without interference." The validity of all the comparisons undertaken by the Barton Report, including the calculation of a premium for going business value, is extremely questionable because, as noted, it does not allow for circumstances actually existing in Cuba in 1960 unrelated to confiscation.

Agemian, in his calculations, took an annual deposit figure of $45.5 million, representing the average of the past five years of deposits. He multiplied this by 5% to come up with $2.25 million as the going concern value based on a multiple of deposits. The difficulty lies with the use of a five year average. These figures are:

| Year | Average Deposits (in millions of dollars) |
|------|-------------------------------------------|
| 1956 | 46.2 |
| 1957 | 49.1 |
| 1958 | 51.8 |
| 1959 | 42.6 |
| 1960 (part) | 38.0 |

These figures show that the deposits declined sharply after the Revolution in 1959, and as previously noted, a substantial part of that decline does not result from any violation of international law. A reasonable approach to valuation would select a "normal" current deposit average figure in-between the 1959–1960 deposits. There is reason to believe that the 1960 deposits reflected the deteriorating conditions, and that prior to the actual taking, the intention to drive out the foreign bankers must have been obvious to a section of the customer public. Those factors which reduced deposits, but which were lawful, had not in 1959 achieved their fullest impact. The Court believes a figure of $40,760,000 represents the weighted average deposits for 1959–1960 of the Bank, and is close to what deposits would have remained if the Cuban Government had been content to make those secular changes short of confiscation which this Court finds to be lawful but adverse in their effect upon the Bank. Using that figure, Agemian's deposit percentage calculation would have yielded a premium figure of $2,038,000.

Agemian derived the 5% multiple used by averaging the multiples used in four acquisitions by Chase of banks in Staten Island (4.62%); the Clinton section of Manhattan (4.03%); the Virgin Islands (8.13%); and Honduras (5.55%). Agemian took the average of these figures which is about 5.5% and reduced it to 5% to be conservative.

The use in the valuation formula of premium prices paid for branches on Staten Island, New York and in the Clinton section of Manhattan tended to reduce the multiple because New York City generally is fairly saturated with branch banks, and the banking business here is and has been highly competitive. The Virgin Islands location was favored by the availability of the due

process provisions of the American Constitution. It is an area of free dollar convertibility, enjoying special tax concessions not available in the continental United States, and is without currency controls. Banking there was not threatened with political problems of the severity present in Cuba after the Revolution. The Honduras bank, selling at a 5.55% multiple, probably reflects a better political and economic environment than that available in Cuba, but not as favorable as Manhattan. Generally, the greater the risk the larger the return demanded by investors, and the more a bank can charge when it lends out its deposits.

The other half of Agemian's calculations were based on a multiple of average yearly earnings. In the period 1956–1960, Chase's reported earnings averaged $344,000. Agemian multiplied this sum by 10 to arrive at a going business value of $3,440,000. He averaged this with the $2.25 million figure based on deposits to reach a total of $2.85 million dollars.

This aspect of Agemian's calculations is subject to the same infirmity, in that it averages in less relevant earnings of pre-revolutionary years. Also, little justification appears in the record to use a multiplier of ten times earnings. Ordinarily, a speculative investment where the likelihood of future success is clouded by ongoing social changes of the sort there present would demand a lower multiplier in an arm's length transaction, because the purchaser cannot foresee for how long he may have assurance of the stream of earnings which he is purchasing.

Under the facts of this case, the net value of the business assets needed to operate the enterprise exceeds ten times the stream of earnings. In addition, the historical earnings of the branch in 1959 and 1960 may be distorted because of imputed interest, which should have been charged against the profits of the branch, for funds of the home office which were tied up in financing its ordinary transactions because of inability to rediscount with Banco Nacional, and/or because of foreign exchange restrictions. In any event, under Agemian's own figures, if

the stream of earnings were priced at ten times the average earnings for the last five years, the total amount resulting therefrom, $3,440,000, is less than the value of the physical assets necessary to devote to the business of banking in order to receive that stream of earnings. This is totally irrational, and suggests that the method is unworthy of consideration. The Court regards the second half of Agemian's calculations as entitled to no weight.

Agemian offered a third calculation based on straight capitalization of earnings as confirmation of his $2.85 million figure (Tr. pp. 111–12). That sum, $2.88 million, came from a calculation of average earnings using a multiple of 20. This multiple was derived from the four acquisitions previously mentioned, at Staten Island (16 × E); Clinton (22 × E); Virgin Islands (27 × E); and Honduras (14 × E), described above. Multiplying average earnings by this multiple of 20 gives a figure of $6,880,000 which, rather than a premium to be added to net asset value, is a total figure which includes within it the value of the assets necessary to operation of the business. Agemian therefore deducted a net asset value of four million dollars from the capitalization figure to reach $2.88 million. The $4,000,000 deduction was too low since in addition to the capital and reserves required to sustain its deposits, the Bank would have to use the real estate Item G. The deductible, as noted earlier, should be $4,054,858, leading to a good will value under this method of $2,825,042. The multiplier of 20 seems inappropriately high. The Court can place no weight on this mathematical exercise.

In this valuation issue, the Court must adopt a method of determining going concern value which is justified by the evidence and reasonable under all of the circumstances. Most of the traditional techniques for computing going concern value of a business are inappropriate or unworkable here, or require the Court to assume facts, and consider future expectations present in most market valuation circumstances, but not available in this case. Past earnings of

a business are usually a good basis for valuation in the manner used by Agemian, by capitalization of earnings. But the validity of any appraisal based on past earnings requires a demonstrated underlying validity for the future of both elements of such a calculation: the figure used as a multiple, and the average earnings sum itself. Neither can be justified. The invalidity of the past historical earnings prior to 1959 as bearing on future earnings is apparent from the secular change occurring in Cuba beginning with the Revolution.

The branches were a declining business in 1959 and 1960, although the earnings of its Cuban branches are as follows (stated without any adjustment for imputed interest in the last two periods):

| Year | Average Earnings |
|------|------------------|
| 1956 | $171,326.70 |
| 1957 | 119,208.02 |
| 1958 | 361,973.10 |
| 1959 | 492,560.02 |
| 1960 (eight months) | 448,388.85 |

As the court noted in *United States v. Brooklyn Union Gas*, 168 F.2d 391, 396 (2d Cir. 1948):

"Care is taken to reject speculative values. Thus the oversimplification of a capitalization of future earnings of the franchise is not resorted to since it must be based upon too many uncertain premises, such as the continuance of the franchise and of the present return therefrom over an indefinite period in the future."

We return to the primary readily available measure of the going business value of the Cuban branches, which should be based on a percentage of the deposits, since deposits are the source of earnings of a bank, and probably the most direct indicator of its future earnings. As noted, Agemian used a five year average, but the deposits were trending downward, due to the secular changes in Cuba. It seems that rather than a five year average, an average based solely on the experiences in 1959 and 1960 would have greater weight. Also, Agemian's multiple of 5% of deposits is a high multiplier for a branch located in Cuba. The late Judge Bryan considered the percentage fig-

ure which should be applied to the deposits and set forth the following information in his notes:

"The defendant's own report, The Barton Report, quotes Arthur Dewing, *The Financial Policy of Corporations*, at pp. 312–313 as saying that the percentage figure applied to deposits of a bank to figure going concern value ranges from 1% to 5%. Under the circumstances here, I would apply a 3.5% figure. I readily admit that this number is selected quite arbitrarily, but my choice is based, as it must be, on my own assessment of the situation, as it has been presented to me by the parties."

This Court can find no better way of determining an appropriate multiple for deposits. Judge Bryan's admittedly arbitrary selection, based as it was upon his familiarity over many years of consideration of the matter, while not binding on the writer, is entitled to some consideration.

Interestingly, Decision No. CU–6295 of the Foreign Claims Settlement Commission, dated October 20, 1971, which fixed the value of Chase's claims, contains the following finding:

"The Commission . . . does not approve claimant's formula for the determination of the 'going concern value' of the branches, but finds that in countries such as Cuba an amount of 3½% of the average deposits during the last five years sufficiently reflects the premium the bank might have received had [Chase] decided to sell the branches or to consolidate them with another bank. Accordingly, 3½% of $45,500,000, the average sum of deposits during the last five years before nationalization, or $1,592,500 will be added to the sum heretofore determined in the Proposed Decision as the loss sustained by [Chase]."

In its proceedings before the Foreign Claims Settlement Commission, Chase had argued for a "going concern value" (actually, "goodwill") to be added to the value of the tangible assets, and "determined on the basis of one-half the sum of 5% of the average deposits during the last five years

plus ten times the average net profits for the last five years."

This Court finds that reliance on use of any such formula and consideration of the price earnings multiples as applied to Cuban operations after January 1, 1959 would be inappropriate, as it is lacking in probative force. Also, while the decision of the Foreign Claims Settlement Commission is admissible and entitled to some weight [F.R. Evid. Rule 803(8)(C)] this Court cannot agree that pre–1959 deposits have any significant relationship to 1960 valuations.

■■■ Applied to a weighted average deposit figure considering only 1959 and 1960, the 3½% computation would produce a premium figure of $1,426,600, which is 3½% of $40,760,000, which should be included in the value of the branches over and above its net asset value. This compares with the sum of $1,592,500 reached by the Foreign Claims Settlement Commission, using a five year deposit average.

This leads to an award of damages to Chase for the taking of its Cuban branches in the amount of $6,904,870, to which amount Chase is entitled as a set-off. This total comprises the following items:

| | | |
|---|---|---|
| A. | Capital, net of adjustments | $4,370,720 |
| B. | Unremitted Profits | 923,320 |
| E. | Contributions to Retirement and Thrift Incentive Plans | 129,372 |
| G. | Banking Houses and Real Estate Appreciation Over Book Value | 54,858 |
| H. | Premium or Goodwill | 1,426,600 |
| | TOTAL | $6,904,870 |

## XV

*Currency Convertibility*

This Court has computed the set-off in dollars, and plaintiff's claim has been stated in dollars. Plaintiff urges that any judgment granted on the counterclaims should be treated as a judgment in pesos, which must be converted into United States dollars at the time of the granting of such judgment. In this particular litigation, the date of granting of the judgment will be of no practical consequence, since both sides of this litigation foresee several years of appellate review in which new battles will be fought, and old ones renewed. Such conversion is sought pursuant to cases such as *Die Deutsche Bank v. Humphrey*, 272 U.S. 517, 47 S.Ct. 166, 71 L.Ed. 383 (1926) and its progeny, including *Conte v. Flota Mercante Del Estado*, 277 F.2d 664 (2d Cir. 1960) and *Island Territory of Curacao v. Solitron Devices*, 356 F.Supp. 1 (S.D.N.Y.1973).

■■■ Cuban pesos are currently without value in the United States, and it is now illegal to convert pesos into dollars. 31 C.F.R. § 515. The customary rule requiring conversion as of the day of judgment was intended to prevent abuse in a situation where a claimant could gain by bringing suit on a claim arising in the foreign country and payable in its currency, in an American court rather than in a foreign court. Conversion into dollars at the date of judgment was supposed to result in a recovery equal to that which would have been obtained in the foreign jurisdiction on the same date. The danger of a kind of forum shopping to seek the jurisdiction which would award the greatest amount of damages is not present here, and to require a conversion on a date not related to reality would create an obvious injustice under the circumstances of this case. As a matter of law, defendant is entitled to a prompt and full compensation, and this notion comprises convertibility. The damages found are based on the official rate of exchange at par prevailing at the time of the confiscation.

■■■ Plaintiff also urges that to allow set-offs, in dollars, to defendants on their counterclaims against plaintiff's recovery in dollars, would enable a circumvention of Cuba's currency control regulations which prohibit unlicensed conversion of pesos to dollars and the transfer of money from Cuba to the United States. Implicit in the argument is the suggestion that the duty to pay for the confiscated property arises in Cuba and may be discharged in pesos. The identical argument was rejected in *Menendez v. Saks & Co.*, 485 F.2d 1355, 1365 (2d Cir. 1973), *rev'd. on other grounds, sub nom., Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 96 S.Ct. 1854,

48 L.Ed.2d 301 (1976), and is rejected here on the same reasoning. See also the opinion of the late Judge Bryan in the *Menendez* case, reported *sub nom. Menendez v. Faber, Coe & Gregg, Inc.*, 345 F.Supp. 527, 540 (S.D.N.Y.1972). Convertibility free of unreasonably restrictive foreign exchange controls seems also to be implicit in the concept of "prompt, adequate and effective" compensation for the expropriated property of aliens. See § 190, Restatement Second, Foreign Relations Law, and discussion following that section. Here, as the court held in *Menendez*, fn. 12 at p. 1365 of 485 F.2d, "if the owners had been awarded pesos rather than dollars, in effect they would have recovered nothing."

## XVI

### *Computation of Damages of Citibank*

The factual and legal situation with respect to the damages of Citibank for the taking of its branches differs little from that with respect to Chase's set-off. Citibank states a single claim representing an aggregate of items. These are:

1. The value of the Cuban branches:
 (a) appraised on a "going concern" basis; $9,510,000.00
 OR
 (b) appraised on a "net worth" basis $5,961,037.00
2. Post-nationalization payment of Cuban branch liabilities $ 809,641.00
3. Claims of employees to which Citibank is subrogated as assignee $ 39,491.00

We consider the third item first because it is simple. As Chase did, and for the same reasons, Citibank "directed" its employees to abjure the realm, consequent on nationalization, and they did so. Like the employees of Chase, Citibank's people abandoned their homes and personal property, which, under Cuban law, became vested in the Cuban Government. Citibank reimbursed these employees in the total amount of $39,491. Such payments were made in the regular course of business, prior to the commencement of litigation, arguably pursuant to the duty which a principal has to indemnify its agent. These payments are confirmed by the regularly kept books and records of Citibank.

This item is disallowed as an item of damages available for purposes of set-off. This result follows solely for the same reasons that payments of an identical nature made by Chase for its employees who fled Cuba following nationalization have been disallowed, see *supra*, p. 459, *et seq.*

The second item of damage arose under factual circumstances indistinguishable from those which occurred with respect to Chase, discussed *supra*, p. 456, *et seq.* The head office of Citibank confirmed approximately $721,000 in commercial letters of credit for the accounts of customers of the Cuban branches prior to September 16, 1960. Once the credits were confirmed, the head office was obliged to make payments to the beneficiaries of these letters of credit in dollars, and did so. The bookkeeping procedures followed by Citibank were the same as those generally used by Chase. The Cuban Government (Banco Nacional) as the owner of Citibank's Cuban branch, became the owner of the loans payable, or money paid or to be paid in pesos, by the Cuban Citibank customers at whose request the letters of credit had been issued. This item is clearly a proper set-off for the same reasons that an identical set-off is being allowed with respect to Chase. In addition, the head office paid customers with respect to items forwarded to Cuba for collection, and in respect of money transfers executed at the instance of the Cuban branches, consisting of bills drawn by customers, or correspondent banks of Citibank, on obligors in Cuba. These instruments were in the process of presentation and collection by the Cuban branches at the time of confiscation. The Cuban Government (Banco Nacional) succeeded to the ownership and possession of these instruments after confiscation, and received the benefits of them, while Citibank paid the corresponding amounts due to the customers. On principles of quasi-contract, and for the same reasons generally applicable to the letters of credit, this item is a proper recovery. Together, the items for collection and the payments made to the beneficiaries of the letters of credit

are a proper basis for set-off in the total amount of $809,641.

Judge Bryan's bench notes indicate that Citibank has already recovered towards its set-off the sum of $5,302,032. This recovery includes the following:

| | |
|---|---:|
| U.S. Treasury Bonds in registered form, which Citibank reported as stolen and obtained reissuance from the U.S. Treasury | $3,000,000.00 |
| Accrued interest on bonds at time of confiscation | 38,111.00 |
| Set-off recovered in Banco I | 2,100,000.00 |
| Private banks set-off | 54,624.00 |
| Miscellaneous home office recoveries | 109,297.00 |
| TOTAL | $5,302,032.00 |

There is also a valid book entry in favor of the Cuban branches (the reverse of an overdraft) due at the time of nationalization from the head office to the Cuban branches in the amount of $762,898.

This leads to a total of $6,065,109.00 already recovered.

This Court has sustained Item 2 of the set-off in the amount of $809,641. Since Citibank can obtain no affirmative recovery in this litigation, in order to set-off fully against the amount of $193,280.30 due Bancec, all that Citibank need show is that its damages from the taking of the branches including good will are at least $5,448,-658.30.

In the proceedings which Citibank conducted before the Foreign Claims Settlement Commission a final decision was entered on November 14, 1969 under No. CU–3835. These findings, which are not binding on the Court but which are clearly relevant and have some evidentiary value under Rule 803(8)(a) and (c), F.R.Evid., fixed an aggregate value of Citibank's eleven Cuban branches on September 17, 1960 at $9,510,000. In this trial, Citibank contended for a higher figure.

The August 23, 1960 statement of Citibank showed the net asset value of the Cuban branches to be $5,961,037.41. To this Citibank sought to add a write-up for the increase of market value over book value of land, building and contents, amounting to $1,700,000.

Based on a review of the entire trial record, the Court is convinced that the books and records of Citibank's Cuban operations, regulated by authorities both American and Cuban, were, like those of Chase, regularly kept in a manner that was substantially correct and in accordance with law. Those books reflected the operations of the Cuban branches in accordance with generally accepted accounting principles consistently applied. The Court is also certain that there was some significant unrealized appreciation in excess of historical depreciated cost with respect to the real estate. The Court believes also that these branches had a good will value in excess of the total value of the assets necessarily devoted thereto. If Citibank's damages were to be computed in the same manner and on the same or similar theories of valuation, as the Court has computed the damages for Chase, the total net result of such a mathematical exercise would considerably exceed six million dollars.

On the total record here, it would appear sufficient to make that finding. No useful purpose would be served by an extensive discussion at this time of the minutiae of other adjustments, additions and subtractions urged by both parties. Even if the Foreign Claims Settlement Commission figures are slightly inflated, they are not so far unrelated to reality that if adjusted, a refund on the part of Citibank would be required, once the theory of set-off is accepted in this case.

There are good reasons to avoid adjudicating with precision at this time a sum of money representing the value of Citibank's branches. The record in this case is of necessity both complex and incomplete. While the parties have waived any objection based thereon, nonetheless it remains true that this Court did not observe the witnesses at the trial and did not hear them testify. Data and information available in Cuba which might be beneficial to either party was not produced, due to difficulties in respect to access. Specifically, the trial record does not include the result of operations through December 30, 1960, which date is said to be the date of valuation and

taking under the Cuban statute. Citibank had an operating loss in August 1960; what was the result for September and October? Were the August results decreased by unlawful conduct of the Cuban Government and perceived likelihood of takeover which chilled the value? Or, was the downturn merely the result of social change entirely lawful under principles of international law? Perhaps the operating results of the former Citibank branches after confiscation would answer this point. The Court could infer that these results are favorable to Citibank because the information is in the "control" of plaintiff, and was not produced, but to do so would be unfair and exalt theory over reality in view of the continuing restrictions on commerce with Cuba.

A court ordinarily does not make unnecessary findings of fact or determine prematurely issues which are in dispute but not essential. The last chapter describing the problems which have arisen between the Republic of Cuba, Banco Nacional and Citibank may not have been written. In the ordinary course of the active business of international banking being conducted by Citibank and also by Banco Nacional, it is conceivable that at some indefinite future time the paths of these parties may cross again. In the ordinary course either bank may become possessed of bills, notes, credits or moneys of the other, and be in a position to use "self-help" leading to further litigation. It appears prudent to defer the making of any unnecessary adjudication of the exact value of the taken branches of Citibank for a future day. It is sufficient for purposes of this case to adjudicate that the value of the confiscated branches of Citibank substantially exceeds the sums already recovered, and therefore the set-off pleaded here may be granted in full in favor of Citibank. To go further with the point at this time would be to engage in judicial mouse-milking.

## CONCLUSION

The foregoing, to the extent appropriate, may be regarded as findings of fact and conclusions of law. Any party may, within fifteen (15) days, present formal requests for additional findings of fact as to any point not disposed of directly or inferentially by this decision. Two separate final judgments, one in each action, shall be settled on waiver of notice of settlement or on fifteen (15) days notice. While it may be academic to do so, the judgments may provide that enforcement be stayed, without bond and without the necessity of any further or additional application, pending appellate finality.